JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 0842

——————————————————— x

MONROE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Individually and On
Behalf of All Others Similarly Situated,

      Plaintiff,

  vs.

YPF SOCIEDAD ANONIMA, REPSOL YPF,
S.A., ANTONIO BRUFAU NIUBO,
ENRIQUE ESKENAZI, SEBASTIÁN
ESKENAZI, ANTONIO GOMIS SÁEZ,
GUILLERMO REDA, ANÍBAL
GUILLERMO BELLONI, MARIO BLEJER,
CARLOS BRUNO, CARLOS DE LA VEGA,
MATÍAS ESKENAZI STOREY, RAÚL
FORTUNATO CARDOSO MAYCOTTE,
SALVADOR FONT ESTRANY, FEDERICO
MAÑERO, FERNANDO RAMÍREZ
MAZARREDO, LUIS SUÁREZ DE LEZO
MANTILLA, JAVIER MONZÓN, MARIO
VÁZQUEZ, MORGAN STANLEY & CO.
INCORPORATED, CREDIT SUISSE
SECURITIES (USA) LLC and GOLDMAN,
SACHS & CO.

      Defendants.

——————————————————— x

Civil Action No.

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

DEMAND FOR JURY TRIAL



## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all those who purchased the American Depositary Shares ("ADSs") of YPF Sociedad Anonima ("YPF" or the "Company") pursuant and/or traceable to the Company's March 23, 2011 offering (the "Offering") seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act.

3.      This Court has jurisdiction of this action pursuant to §22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

4.      Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District. The Offering was marketed in this District, the Underwriters each maintain their principal places of business in this District and YPF ADSs are traded over the New York Stock Exchange ("NYSE"), which is based in this District.

5.      In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NYSE.

## PARTIES

6.      Plaintiff Monroe County Employees' Retirement System purchased YPF ADSs, as set forth in the certification attached hereto and incorporated herein by reference, in the Offering, and was damaged thereby.

7.      Defendant YPF, an Argentine corporation, maintains its principal executive offices at Macacha Guemes 514 C1106BKK Buenos Aires, Argentina.

8.     Defendant Repsol S.A., formerly known as Repsol YPF, S.A. ("Repsol"), is a limited liability company that exists under the laws of the Kingdom of Spain. Repsol's principal executive offices are located at Paseo de la Castellana 278, 28046 Madrid, Spain. Repsol was the sole selling shareholder in the Offering.

9.     Defendant Antonio Brufau Niubo ("Niubo") was YPF's Chairman and Director. Niubo signed the Form F-3 Registration Statement, which became part of the Prospectus.

10.     Defendant Enrique Eskenazi was YPF's Vice-Chairman and Director.

11.     Defendant Sebastián Eskenazi was YPF's Executive Vice-Chairman, Chief Executive Officer and Director.

12.     Defendant Antonio Gomis Sáez ("Sáez") was Repsol's Argentina General Director, Assistant Director to Sebastián Eskenazi and Director of YPF.

13.     Defendant Guillermo Reda ("Reda") was YPF's Chief Financial Officer.

14.     Defendant Aníbal Guillermo Belloni ("Belloni") was a Director of YPF.

15.     Defendant Mario Blejer ("Blejer") was a Director of YPF.

16.     Defendant Carlos Bruno ("Bruno") was a Director of YPF.

17.     Defendant Carlos de la Vega ("de la Vega") was a Director of YPF.

18.     Defendant Matías Eskenazi Storey ("Storey") was Assistant Director to Sebastián Eskenazi and a Director of YPF.

19.     Defendant Raúl Fortunato Cardoso Maycotte ("Maycotte") was a Director of YPF.

20.     Defendant Salvador Font Estrany ("Estrany") was a Director of YPF.

21.     Defendant Federico Mañero ("Mañero") was a Director of YPF.

22.     Defendant Fernando Ramírez Mazarredo ("Mazarredo") was a Director of YPF.

23.     Defendant Luis Suárez de Lezo Mantilla ("Mantilla") was a Director of YPF.

24.     Defendant Javier Monzón ("Monzón") was a Director of YPF.

25.     Defendant Mario Vázquez ("Vázquez") was a director of YPF.

26.     The Defendants listed above at ¶¶9-25 are collectively referred to herein as the "Individual Defendants." The Individual Defendants signed the Registration Statement, as defined herein.

27.     By reason of their management positions and their ability to make public statements in the name of YPF, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) YPF to engage in the conduct complained of herein.

28.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is an investment bank with offices at 15895 Broadway, New York, NY 10036. Morgan Stanley was one of the underwriters for the IPO and agreed to distribute 6,832,000 shares of YPF ADSs.

29.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment bank with offices at 11 Madison Avenue, New York, NY 10010.  Credit Suisse was one of the underwriters for the IPO and agreed to distribute 4,497,000 shares of YPF ADSs.

30.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is an investment bank with offices at 200 West Street, New York, NY 10282.  Goldman Sachs was one of the underwriters for the IPO and agreed to distribute 4,384,000 shares of YPF ADSs.

31.     Defendants referenced in ¶¶28-30 above are collectively referred to herein as the "Underwriters" or "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased the ADSs of YPF pursuant and/or traceable to the Company's Offering.  Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director

- 3 -

or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

33.    The members of the Class are so numerous that joinder of all members is impracticable.  Repsol sold more than 26 million ADSs in the Offering.  The precise number of Class members is unknown to plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of YPF, its transfer agent, or the Underwriters to the Offering.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

34.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

35.    Plaintiff's claims are typical of the claims of the other members of the Class because plaintiff and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

36.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that

will be encountered in the management of this litigation that would preclude its maintenance as a class action.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the Prospectus issued by defendants to the investing public in connection with the Offering contained untrue statements of material facts or omissions about YPF and its business; and

(c)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### Repsol's Control of YPF Begins to Loosen in 2008

38.     YPF describes itself as "Argentina's leading energy company, operating a fully integrated oil and gas chain with leading market positions" in the exploration, development and production of crude oil, natural gas and liquefied petroleum gas, and the refining, marketing, transportation and distribution of energy based products.  As of December 31, 2011, YPF held 141 exploration permits and production concessions in Argentina.  These concession contracts granted YPF the ability to drill on various Argentine provinces' land in exchange for oil and gas royalties. The concession contracts granted YPF the right and responsibility to explore, develop, produce and sell oil and gas in the province.  YPF directly operates 103 of them, including 43 exploration permits and 60 production concessions.

39.    Since 1999, YPF has been owned and controlled by Repsol. Repsol is an integrated oil and gas company that is engaged in all aspects of the oil and gas industry. At the time of the Offering, Repsol owned and controlled more than 75% of YPF.

40.    In response to the Argentine government's effort to increase Argentinean ownership of strategic assets (which included companies that benefited from the natural resources of Argentina) and to give the government a say within YPF, in late 2007, Repsol agreed to sell up to 25% of YPF to businessman Enrique Eskenazi's Petersen Group, which was closely allied with the Argentinean government. The deal would initially give the Petersen Group 14.9% of YPF for $2.235 billion and an option to buy another 10.1% within the next four years. In May 2011, the Petersen Group exercised its option to purchase 10% of YPF for approximately $1.3 billion through loans from Repsol ($625 million), Itaú BBA ($227.9 million), Credit Suisse ($270 million), Citibank ($80 million), Standard Bank ($79.6 million) and BNP Paribas ($42.4 million).

41.    The Eskenazi family rose to political, social and economic fame in Argentina over the years through their various bank ownerships and construction companies. The Eskenazi family's patriarch, billionaire Enrique Eskenazi, was a close friend and confidant of Argentine President Néstor Kirchner ("Kirchner"). Kirchner was President of Argentina from May 2003 until December 2007. He was succeeded by his wife, Cristina Fernández de Kirchner ("Fernández"). Kirchner died in October 2010. The Eskenazi family's ties with Kirchner stem from their real-property development projects in Kirchner's home province of Santa Cruz, which he governed for ten years before becoming president, as well as a majority stake in the state bank of Santa Cruz.

42.    The Petersen Group's acquisition of YPF shares was paid for using loans from a group of banks and Repsol. As collateral for the loans, the Petersen Group was allowed to put up the actual YPF shares it was purchasing from Repsol. In order to pay back the loans, the Petersen Group

used the dividends it received from its ownership interest in YPF stock. The Petersen Group specifically structured this transaction with the expectation that it would continue to receive these unusually high dividends, which it would then use to pay back the loans.

43. After acquiring its stake in YPF, the Eskenazi family was quickly placed in controlling positions at YPF. Defendant Enrique Eskenazi was ushered in as YPF's Vice-Chairman and Director. Enrique's son, Defendant Sebastián Eskenazi, was placed as YPF's Executive Vice-Chairman, Chief Executive Officer and Director. Defendant Matías Eskenazi Storey, Enrique's other son, assumed the roles of Assistant Director and Director of YPF.

44. Despite the Petersen Group's placement in YPF as the Argentinean government's "man on the ground," the risk that the Argentinean government would demand a greater interest in YPF, including the possibility of a complete takeover of the company, i.e. nationalization, persisted since the Argentinean government was dissatisfied with the way that YPF was being run. Specifically, the Argentinean government was dissatisfied that: (i) Argentina was becoming a net importer of natural gas and oil, despite having its own supply of natural resources, (ii) YPF was not adequately producing oil and gas within Argentina, and (iii) YPF was continuing to distribute a large portion of its profits to Repsol and its other shareholders in the form of high dividends instead of reinvesting them back into the Company and its operations. Moreover, Argentina had recently begun to nationalize other industries. For example, in October 2008, Argentina's government announced that it would seek to nationalize nearly $30 billion in private pension funds to protect retirees from falling stock and bond prices during the global financial crisis. Moreover, in December 2008, the Argentine government passed a bill to nationalize Aerolineas Argentinas SA – the nation's airline.

45.     As further evidence of YPF's lack of production, YPF was a beneficiary of Argentina's Petroleo Plus program, which was put into effect by the Argentinean government on October 1, 2008.  The purpose of the program was to increase oil reserves, grow oil production and resume exporting petroleum from Argentina.  Petroleo Plus awarded companies with fiscal credits that could be applied against export taxes based on production growth and replacement of total proved reserves.  The greater the increase in a company's reserves and production, the greater the tax benefits that company received.  YPF was able to reach certain benchmarks as defined under the program until the first quarter of 2011 – the quarter of the Offering.  In fact, YPF failed to reach these benchmarks for at least the next two quarters.  The program was ultimately suspended on February 3, 2012 by President Fernandez because the Argentinean government felt the program had reached its initiatives and ending the program would save the government 2 billion pesos per year of suspension.

46.     However, prior to and after the Offering, YPF, at the direction of Repsol and the Eskenazi family, continued to pay abnormally high dividends (80 to 90 percent) for their own benefit rather than invest in the production of oil and gas through their concession contracts.  Such behavior ultimately led to the Company's nationalization.

### The Registration Statement and Prospectus Contained Untrue Statements of Material Fact and Omitted to State Material Facts that Were Required to be Disclosed

47.     On or about November 26, 2010, YPF filed with the Securities and Exchange Commission ("SEC") a Form F-3 Registration Statement (the "Registration Statement") for the Offering.

48.     On or about March 23, 2011, the Prospectus with respect to the Offering, which forms part of the Registration Statement (the Registration Statement and Prospectus are hereinafter referred to as the "Registration Statement"), became effective and more than 26.2 million shares of YPF

ADSs were sold to the public at $41 per share, thereby valuing the total size of the Offering at more than $1 billion.

49.      The Registration Statement, and the documents referenced and incorporated therein, contained numerous untrue statements of material facts and omitted to state material facts required to be stated therein in order to make the statements contained therein not misleading.

50.      On February 24, 2011, the Company filed its Form 6-K with the SEC.  In describing the Company's political and regulatory risk factors, defendants stated, in pertinent part, as follows:

> We currently face risks and challenges relating to government regulation and control of the energy sector, including those set forth below and elsewhere in these risk factors:
>
> -limitations on our ability to pass higher domestic taxes, increases in production costs, increases in international prices of crude oil and other hydrocarbon fuels and exchange rate fluctuations through to domestic prices, or to increase local prices of natural gas (in particular for residential customers);
>
> -higher taxes on exports of hydrocarbons;
>
> -restrictions on hydrocarbon export volumes driven mainly by the requirement to satisfy domestic demand;
>
> -in connection with the Argentine government's policy to provide absolute priority to domestic demand, regulatory orders to supply natural gas and other hydrocarbon products to the domestic retail market in excess of previously contracted amounts; and
>
> -the implementation or imposition of stricter quality requirements for petroleum products in Argentina.

51.      Similarly, with respect to Argentine regulations and policies, the Registration Statement stated, in pertinent part, as follows:

> The Argentine government has made certain changes in regulations and policies governing the energy sector to give absolute priority to domestic supply at low, stable prices in order to sustain economic recovery. As a result of the above-mentioned changes, for example, on days during which a gas shortage occurs, exports of natural gas (which are also affected by other government curtailment orders) and the provision of gas supplies to industries, electricity generation plants and service stations selling compressed natural gas are interrupted for priority to be

given to residential consumers at lower prices. We cannot assure you that changes in applicable laws and regulations, or adverse judicial or administrative interpretations of such laws and regulations, will not adversely affect our results of operations. See "Item 4. Information on the Company—Regulatory Framework and Relationship with the Argentine Government" in our annual report on Form 20-F for the fiscal year ended December 31, 2009 (the "2009 Form 20-F"). See "Item 1. Company Overview—Recent Regulatory Developments" in our September 30, 2010 Form 6-K. Similarly, we cannot assure you that future government policies aimed at sustaining economic recovery or in response to domestic needs will not adversely affect the oil and gas industry.

52.     In describing the concession contracts that the Company held with the Argentine

provinces, the Company's Form 6-K stated, in pertinent part, as follows:

The Hydrocarbons Law provides for oil and gas concessions to remain in effect for 25 years as from the date of their award, and further provides for the concession term to be extended for up to 10 additional years, subject to terms and conditions approved by the grantor at the time of the extension. The expiration of part of our and other Argentine oil companies' concessions occurs in 2017. Such concessions represented approximately 50% of our proved reserves at December 31, 2009. The authority to extend the terms of current and new permits, concessions and contracts has been vested in the governments of the provinces in which the relevant area is located (and the federal government in respect of offshore areas beyond 12 nautical miles). In order to be eligible for the extension, any concessionaire and permit holder must have complied with its obligations under the Hydrocarbons Law and the terms of the particular concession or permit, including evidence of payment of taxes and royalties, the supply of the necessary technology, equipment and labor force and compliance with various environmental, investment and development obligations. **Under the Hydrocarbons Law, non-compliance with these obligations and standards may also result in the imposition of fines and in the case of material breaches, following the expiration of applicable cure periods, the revocation of the concession or permit.** We cannot provide assurances that concessions that have not yet been renewed will be extended or that additional investment, royalty payment or other requirements will not be imposed on us in order to obtain extensions. **The termination of, or failure to obtain the extension of, a concession or permit could have a material adverse effect on our business and results of operations.**

53.     In addition, with regard to the concession contracts, the Registration Statement stated,

in pertinent part, as follows:

Exploration permits and production or transportation concessions may be terminated upon any of the following events:

• failure to pay annual surface taxes within three months of the due date;

- 10 -

• failure to pay royalties within three months of the due date;

• **substantial and unjustifiable failure to comply with specified production, conservation, investment, work or other obligations;**

• repeated failure to provide information to, or facilitate inspection by, authorities or to utilize adequate technology in operations;

• in the case of exploration permits, failure to apply for a production concession within 30 days of determining the existence of commercially exploitable quantities of hydrocarbons;

• bankruptcy of the permit or concession holder;

• death or end of legal existence of the permit or concession holder; or

• failure to transport hydrocarbons for third parties on a non-discriminatory basis or repeated violation of the authorized tariffs for such transportation.

[Emphasis added.]

54.    The statements referenced above in ¶¶50-53 were untrue statements of material fact and omitted to state material facts because the Registration Statement failed to disclose and misrepresented the following adverse facts, among others, which existed at the time of the Offering:

(a)    that the Company faced a risk of nationalization by the Argintinean government;

(b)    that the risk of nationalization had increased because of the Company's failure to: (i) adequately produce oil and gas within Argentina; and (ii) reinvest a substantial portion of its profits back into the Company and its operations;

(c)    that the Company was in breach of its concession contracts with various Argintinean provinces; and

(d)    that nationalization by the Argentine government would likely have a severe adverse effect on shareholders and on the Company's market value.

- 11 -

55.     The instructions and regulations that governed the preparation of the Registration Statement required that YPF disclose the facts detailed above. The Registration Statement, however, failed to include these material facts.

56.     Shortly after the death of former President Kirchner, President Fernández began issuing warnings to Defendants that they should lower their dividend payouts and increase their investments in their Argentinean concession contracts. Despite the warnings, YPF continued to underproduce and failed to provide the proper financing for many potential energy projects.

57.     On November 2, 2011, the Company's Board of Directors held a meeting to discuss, among other things, the Company's dividend. On that date, the majority of the directors approved the payment of dividends at the same rate that the Company had paid in the past. On November 10, 2011, Repsol held a conference call with investors and analysts to discuss their third quarter 2011 earnings. In response to a question about YPF's dividend payment, Miguel Martinez, Repsol's CFO, stated, in pertinent part, as follows:

Thomas Adolff - Credit Suisse - Analyst

. . . Second, on YPF, just on the question on the Board Meeting, out of the 17 Board members, the Government rep rejected the dividend payment. And I understand this was really the first time they did that, so I wondered whether you can talk about why the Government rejected this, whether it's related to the Government wanting YPF to invest more domestically, or anything to do with money supply in the country.

*     *     *

Miguel Martinez - Repsol YPF SA - CFO

. . . In relation with the dividend in YPF, as I mentioned, the dividend will be paid and the Government doesn't have any right to cancel this dividend. It's not an issue - - that in the bylaws of the Company the Government has any right to modify the majority.

58.     On January 30, 2012, the Company's ADSs declined $4.02 per ADS, or over 10%, to close at $35.86 per ADS on news that Argentine officials were discussing a takeover of YPF. In an

article entitled "YPF Tumbles Most in Six Months on Report of Takeover," Bloomberg reported that "Argentine government officials, lawmakers and oil industry specialists discussed re-nationalizing" YPF because of its lack of investment in Argentina. Moreover, the Argentine government is "probing alleged fuel-price fixing by YPF . . . and other producers."

59.    In early February 2012, Argentinean Planning Minister, commenting on YPF's lack of production and investment in Argentina, stated, in pertinent part, as follows:

> Although YPF has 60 per cent of the fuel market, it has not conducted the investment necessary to expand its refineries in the timeframe needed by the sustained growth in demand in the country.

> \*       \*       \*

> There were companies that made the most of the [Oil Plus] benefits and boosted reserves, like Apache, Medanito, Roch and various small companies but unfortunately the overall fall could not be reversed because our country's biggest oil company, YPF, did not invest in exploration or start up the shale oil developments or even present a credible and sustainable schedule to develop them.

60.    On February 29, 2012, the Company's ADSs declined $4.37 per ADS, or over 14%, to close at $26.23 per ADS on news that Defendant Brufau was meeting with President Fernández in response to her criticism of the Company's lack of investment in Argentina. The meeting came at the heels of her State of the Union address where investors speculated that the Company could be nationalized.

61.    On April 16, 2012, President Fernández announced that the government would nationalize YPF and seize a majority stake in YPF from Repsol. Moreover, President Fernández ousted Defendant Sebastian Eskenazi as YPF's CEO and named two top aides, Julio de Vido and Axel Kicillof, to run the Company. President Fernández cited to YPF's lack of production and investment in Argentina as well as Argentina's history of spending billions of dollars on importing gas and petroleum despite its plentiful natural resources.

62.     Upon this news, trading in the Company's ADSs were halted on April 17, 2012. When trading resumed on April 18, 2012, the price of the Company's ADSs declined $6.38 per ADS, or over 32%, to close at $13.12 per ADS, on significantly heavy trading volume.

63.     On June 17, 2012, the newly nationalized YPF agreed to pay dividends of only $66.6 million and set aside $1.26 billion for investment purposes.  This is in stark contrast to YPF's previous dividend policy which called for a distribution of 80 to 90 percent of its profits to shareholders.

64.     With the Argentine government now in control, YPF immediately began investing and producing again. In only the first 15 days following the nationalization, YPF oil and gas production rose 6.5% and 8.4% respectively. Gasoline dispatches also rose dramatically, with a 250% increase over the same holiday period from the year before.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

65.     Plaintiff repeats and realleges each and every allegation contained above.

66.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

67.     The Registration Statement for the Offering was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

68.     YPF is the registrant for the Offering.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

69.     As issuer of the ADSs, YPF is strictly liable to plaintiff and the Class for the misstatements and omissions.

70.     The Underwriter Defendants were each Underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Offering and the Company's securities sold through the Registration Statement. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and the Prospectus were true, were without omission of any material facts, and/or were not misleading.

71.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

72.     Plaintiff acquired ADSs of YPF pursuant and/or traceable to the Registration Statement.

73.     The value of YPF ADSs has declined substantially and plaintiff and the Class have sustained damages as a result of defendants' violations.

74.     Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this Complaint.  Likewise, less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this Complaint.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

75.     Plaintiff repeats and realleges each and every allegation set forth above.

76.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class.

77.     Defendants were sellers and offerors and/or solicitors of purchasers of the ADSs offered pursuant to the Prospectus.

78.     As set forth above, the Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the inaccurate and misleading Prospectus and participating in efforts to market the Offering to investors.

79.     The Underwriter Defendants participated in the dissemination of the false and misleading Prospectus for their own financial gain. But for their participation, the Offering could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a)     made a decision to conduct the Offering at a price set forth in the offering documents. The Underwriter Defendants drafted, revised, and/or approved the Prospectus. The Prospectus was crafted to create an interest in YPF securities and was widely distributed by or on behalf of these defendants for that purpose;

(b)     finalized the Prospectus and caused it to become effective; and/or

(c)     conceived and planned the Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities, and supervising their distribution and ultimate sale to the investing public.

80.     Defendants owed to the purchasers of YPF ADSs, including plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were accurate and that they did not contain any

misstatement or omission of material fact.  Defendants, in the exercise of reasonable care, should have known that the Prospectus contained misstatements and omissions of material fact.

81.     Plaintiff and the other members of the Class purchased or otherwise acquired YPF ADSs pursuant to the Prospectus, and neither plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Prospectus.

82.     Plaintiff, individually and on behalf of the Class, hereby offers to tender to defendants those shares of ADSs that plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

**COUNT III**

**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

83.     Plaintiff repeats and realleges each and every allegation contained above.

84.     This Count is brought pursuant to §15 of the Securities Act against the Individual Defendants.

85.     Each of the Individual Defendants was a control person of YPF by virtue of his position as a director and/or senior officer of YPF.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of YPF.

86.     Each of the Individual Defendants was a culpable participant in the violation of §11 of the Securities Act alleged in Count I above, based on their having signed the Prospectus and having otherwise participated in the process which allowed the Offering to be successfully completed.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment, as follows:

A.      designating plaintiff as the Lead Plaintiff and its counsel as Lead Counsel and declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.      awarding plaintiff and other members of the Class damages together with interest thereon;

C.      awarding plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements;

D.      awarding plaintiff and other members of the Class rescission on their §12(a)(2) claims; and

E.      awarding plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 5, 2013              ROBBINS GELLER RUDMAN
                                                      & DOWD LLP
                                                      SAMUEL H. RUDMAN
                                                      DAVID A. ROSENFELD
                                                      MARIO ALBA JR.

                                                      SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
malba@rgrdlaw.com

VANOVERBEKE MICHAUD &
TIMMONY P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, Michigan 48201
Telephone:  313/578-1200
313/578-1201  (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

YPF

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 day of January, 2013.

MONROE COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Its: _____

- 2 -

YPF

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/08/2011 | 250 | $46.23 |
| 05/10/2011 | 100 | $46.05 |
| 06/10/2011 | 115 | $42.97 |
| 07/08/2011 | 115 | $45.93 |