UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　vs.<br><br>YPF SOCIEDAD ANONIMA, et al.,<br><br>　　　　　　　　　Defendants. | Civil Action No. 1:13-cv-00842-SAS (Consolidated)<br><br>Oral Argument Requested |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT REPSOL, S.A.'S MOTION TO DISMISS**

LATHAM & WATKINS LLP
Miles N. Ruthberg
James E. Brandt
Christopher R. Harris
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Attorneys for Defendant Repsol, S.A.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

I.   THE OPPOSITION CONFIRMS THAT PLAINTIFFS PLEAD NO MATERIAL OMISSIONS ..........................................................................3

    A.   Plaintiffs Concede That Repsol Disclosed The Facts Relevant To The Risk Of Expropriation ................................................................3

    B.   Repsol Admittedly Disclosed The Supposed Motives Alleged in the SAC, Which Were Also Admittedly Immaterial .............................5

    C.   Repsol Cannot Be Liable For Failing To Pejoratively Characterize YPF's Investment Levels ......................................................6

    D.   The SAC Does Not And Could Not Allege That Repsol "Promised" Any Level Of Investment Or Increased Production ...................7

    E.   Repsol Had No Duty To Make Further Disclosures About The Risk Of Expropriation ..............................................................8

II.  THE OPPOSITION DISPROVES PLAINTIFFS' THEORIES OF SCIENTER ..............10

    A.   The SAC's Alleged Motive Is Admittedly Implausible .......................................10

    B.   Repsol Was Not Reckless In Failing to Predict The Expropriation As The Opposition Cites No Non-Public Information Available To Repsol About the Risk of Expropriation ..................................................11

III. THE OPPOSITION DISPROVES CAUSATION ...........................................12

    A.   Repsol's Early 2012 Statements Cannot Have "Reassured" Lead Plaintiff About The Risk of Expropriation .......................................12

    B.   The Only Allegedly Concealed "Facts" Admittedly Were Not Revealed Until After The Losses Occurred And Thus Could Not Have Caused The Losses .............................................................13

IV.  THE SECURITIES ACT CLAIMS ARE UNTIMELY ...................................15

CONCLUSION..........................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alabama Farm Bureau Mut. Cas. Co., Inc. v. Am. Fid. Life Ins. Co.*,
606 F.2d 602 (5th Cir. 1979) ................................................................. 6

*Atlantic Gypsum Co. v. Lloyds Int'l Corp.*,
753 F. Supp. 505 (S.D.N.Y. 1990) ........................................................ 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ..................................................................... 5

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ........................................ 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................... 5

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) .................................................... 7

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ............................................................... 12

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................... 7

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002) ................................................................... 5

*In re Bank of America AIG Disclosure Sec. Litig.*,
2013 WL 5878814 (S.D.N.Y. Nov. 1, 2013) .......................................... 9

*In re Cabletron Sys. Inc.*,
311 F. 3d 11 (1st Cir. 2002) ................................................................ 11

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
2013 WL 6621024 (S.D.N.Y. Dec. 12, 2013) ...................................... 10

*In re GeoPharma, Inc.*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006) .................................................. 11

*In re Lehman Bros. Sec. & ERISA Litig.*,
903 F. Supp. 2d 152 (S.D.N.Y. 2012) .................................................. 15

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.,*
 541 F. Supp. 2d 986 (S.D. Ohio 2007) .................................................................. 11

*In re Optimal U.S. Litig.,*
 No. 10 Civ. 4095 (SAS), 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ..................... 8

*In re Parmalat Securities Litig.,*
 375 F. Supp. 2d 278 (S.D.N.Y. 2005) ................................................................... 14

*In re Prestige Brands Holding, Inc.,*
 2006 WL 2147719 (S.D.N.Y. July 10, 2006) .......................................................... 15

*In re ProShares Trust Sec. Litig.,*
 728 F.3d 96 (2d Cir. 2013) ..................................................................................... 7

*Jones v. Perez,*
 2013 WL 6800604 (2d Cir. Dec. 26, 2013) ............................................................. 9

*Lentell v. Merrill Lynch & Co.,*
 396 F.3d 161 (2d Cir. 2005) .......................................................................... 13, 14

*Medis Investor Grp.. v. Medis Techs., Ltd.,*
 586 F. Supp. 2d 136 (S.D.N.Y. 2008) ................................................................... 11

*Mizzaro v. Home Depot, Inc.,*
 544 F.3d 1230 (11th Cir. 2008) ............................................................................ 10

*Novak v. Kasaks,*
 216 F.3d 300 (2d Cir. 2000) ................................................................................. 12

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.,*
 898 F. Supp. 2d 673 (S.D.N.Y. 2012),
 *aff'd,* 2013 WL 6644838 (2d Cir. Dec. 18, 2013) ................................................... 7

*Repsol YPF, S.A., et al. v. Republic of Argentina,*
 No. 12 Civ. 3877 (S.D.N.Y.) (TPG) ..................................................................... 14

*Richman v. Goldman Sachs Grp., Inc.,*
 868 F. Supp. 2d 261 (S.D.N.Y. 2012) ..................................................................... 9

*S. Cherry St., LLC v. Hennessee Grp. LLC,*
 573 F.3d 98 (2d Cir. 2009) ............................................................................ 10, 11

*Schenk v. Citibank/Citigroup/Citicorp,*
 No. 10 Civ. 5056 (SAS), 2010 WL 5094360 (S.D.N.Y. Dec. 9, 2010) ..................... 14

*Sgalambo v. McKenzie,*
 2010 WL 3060604 (S.D.N.Y. Apr. 30, 2010) ......................................................... 12

*Sgalambo v. McKenzie*,
   739 F. Supp. 2d 453 (S.D.N.Y. 2010) ...................................................................... 10

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ...................................................................... 10

*Solow v. Citigroup, Inc.*,
   2012 WL 1813277 (S.D.N.Y. May 18, 2012) ...................................................... 2, 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...................................................................... 10, 11

## PRELIMINARY STATEMENT

After multiple substitutions of parties and claims, Plaintiffs' opposition brief (the "Opposition" or "Opp.") yet again switches their theory of the case for a new one, even less plausible than the last.  Plaintiffs recognize that it would make no sense for Repsol knowingly to jeopardize an eleven-figure majority stake in YPF for the purpose of receiving dividends and yields on minor share divestitures.  They therefore abandon this argument and hypothesize a new motive for the supposed fraud:  forcing Argentina to raise oil prices by reducing investment in production.  This motive is not only not pled as the basis for fraud, but is patently false, as Plaintiffs now admit the historic ***increase*** in YPF's spending during the heart of the class period.

Indeed, Repsol's alleged fraud is murkier than ever.  The SAC[1] asserts that Repsol concealed a scheme to fund dividends and Repsol's international expansion instead of Argentine production.  *See* SAC ¶ 125.  But the Opposition admits that Repsol ***accurately disclosed all of the "hard" facts*** regarding YPF's production, investments and dividends, *see* Opp. at 15, and does not attempt to dispute that Repsol announced the details of its overseas spending.  It also admits that Repsol disclosed that "nationalization, expropriation, or cancellation of contract rights" were material risks for YPF, *id.* at 19, admits that there were numerous public reports revealing precisely "an elevated risk that YPF might be nationalized," Opp. at 44, and never disputes that Repsol had no non-public knowledge, different from these public reports, of Argentina's designs on YPF.

Thus, the Opposition abandons any plausible claim that Repsol misled investors about production, investment or dividend levels, divestitures, overseas spending, or the likelihood of nationalization.  Plaintiffs instead argue that Repsol "plunder[ed]" YPF and thereby increased

---

[1] Unless otherwise defined, capitalized terms have the definitions in Repsol's Memorandum of Law in Support of its Motion to Dismiss, ECF No. 44 ("Repsol MTD" or "Repsol's MTD").

the risk of a government takeover.  Opp. at 12.  But since Repsol admittedly disclosed all of its management decisions supposedly "plundering" YPF, at best the Opposition describes a (meritless) derivative claim for mismanagement, not securities fraud.

Nevertheless, Plaintiffs attempt to sustain their fraud claim based on four flawed strategies.  First, Plaintiffs argue that Repsol concealed its supposed "true motives" to drive up oil prices by cutting YPF's exploration budget.  But even if this motive were (i) alleged or (ii) plausible, Section 10(b) imposes no duty to reveal the motives underlying disclosed actions.

Second, Plaintiffs argue that Repsol should have characterized YPF's admittedly-disclosed investment levels as "inadequate" and "insufficient."  Opp. at 15, 16.  This argument fails not only because Plaintiffs admit that YPF broke investment records in both 2010 and 2011, *id.* at 15, but also because Repsol had no duty to "characterize its behavior in a pejorative manner."  *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012) (internal quotation marks and citation omitted).

Third, the Opposition launches new, un-pled accusations: that Repsol made "public promises" to "sufficiently develop [the] *Vaca Muerta*" energy reserves, Opp. at 23, and a "public commitment to significantly increase energy production in Argentina," *id.* at 15.  However, the SAC alleges neither, because Repsol never made any such promises.  Indeed, as is clear from the statements quoted in the SAC, Repsol (i) never pledged to spend any particular amount developing *Vaca Muerta*, much less to spend enough to "sufficiently develop" it by itself, and (ii) never pledged to increase production.  Repsol spoke, instead, only of ***exploration***.

Fourth, in seizing on the Mosconi Report to try to find some "information" that was not disclosed, the Opposition actually disproves loss causation, *i.e.,* Plaintiffs' theory that the revelation of Repsol's supposedly-omitted motive caused Argentina to nationalize YPF.  *See* Opp. at 43.  But the SAC pleads that Repsol's admittedly disclosed ***conduct*** (low investments

2

and high dividends)—not any supposedly-omitted motive for that conduct—caused the takeover. *See* SAC ¶ 63.  More damning, Repsol's alleged price-increase motive could not have triggered Argentina's April 2012 decision to take over YPF or caused any alleged loss to the class, since the SAC and the Opposition concede this supposed motive did not become known to anyone (including the Argentine Congress that voted to renationalize YPF) until ***months later***: the Mosconi Report was issued in June 2012, *see* Opp. at 50-51, and Argentina's so-called "audit" leading to the Mosconi Report admittedly did not begin until ***after*** the takeover, *see* SAC ¶ 11.

## I.   THE OPPOSITION CONFIRMS THAT PLAINTIFFS PLEAD NO MATERIAL OMISSIONS

### A.   Plaintiffs Concede That Repsol Disclosed The Facts Relevant To The Risk Of Expropriation

The sole basis for Plaintiffs' fraud claim in the SAC is that Repsol allegedly concealed the following "facts":

> (i) that Repsol was deliberately not investing in Argentinean exploration projects and, instead, was using YPF's profits to pay unusually high dividends and to fund Repsol's own international expansion efforts; (ii) that YPF's failure to finance domestic exploration and development caused the Company to breach its concession contracts with various Argentinean provinces; (iii) that YPF's failure to invest domestically increased the risk that the Company would be nationalized; and (iv) that nationalization by the Argentinean government would likely have a severe adverse effect on shareholders and on the Company's market value.

SAC ¶ 125; *see id.* ¶¶ 134, 145 (describing the only alleged "false and misleading" statements and each referring to alleged omissions in ¶ 125).  However, the Opposition:

- Admits that Repsol "disclosed certain information about dividend payments and divestiture plans," Opp. at 15, and fails to dispute that this "information" in fact included details of all past and planned dividends and divestitures, including the stated policy to pay 90% of earnings as dividends, *see* Repsol MTD at 11-12, and its plan to sell down its YPF shares to just over 50%, *see id.* at 8;

- Admits that Plaintiffs "***do not challenge the accuracy of YPF's 'hard' numbers*** regarding investments, costs or any other metric relating to its domestic oil and gas projects," Opp. at 15 (emphasis added), which included the disclosures showing that YPF set new records for investment in both 2010 and 2011, *see* Repsol MTD at 11;

and does not dispute that Repsol incorporated these "'hard' numbers" by reference into all of Repsol's statements at issue, *see id.* at 11-12;

- Makes no attempt to dispute that Repsol likewise detailed all of its overseas investments in the statements at issue and in public filings, and thus concedes that it did, *see id.* at 12 & n.16;

- Admits that Repsol disclosed the material risks of "nationalization, expropriation, or cancellation of contract rights" for YPF, Opp. at 19, and moreover admits that Plaintiffs themselves could not state any Securities Act claims prior to the takeover (even under mere notice pleading) based on reports revealing that "there was an elevated risk that YPF might be nationalized," *id.* at 44, because even a publicly-disclosed "elevated risk"—exactly what Repsol supposedly should have disclosed, *see* SAC ¶ 125(iii)—was too uncertain; and

- Makes no attempt to defend the plausibility of the SAC's allegation that YPF actually violated concession contracts, instead mistakenly arguing that Repsol "concedes" that they were violated, Opp. at 16 n.7, whereas Repsol's opening brief said the opposite, *see* Repsol MTD at 13.[2]

Thus, Plaintiffs abandon any claim that Repsol concealed or misrepresented dividends, investments (in Argentina or by Repsol abroad), Repsol's sales of YPF shares, or the risk of expropriation.  Consequently, even if the Opposition were correct (and it is not) that "Repsol implemented several superficial ploys designed to placate the Argentine government and forestall a potential nationalization of YPF, thereby allowing Repsol to plunder the assets of and divest its holdings in YPF," Opp. at 12, this would not matter.  At best, this new thesis alleges a (meritless) derivative action for mismanagement, not fraud, because Repsol admittedly disclosed the exact details of the investments and exploratory efforts supporting the alleged "ploys," as well as all dividends and divestitures.[3]  *See id.* at 15.

---

[2] Regardless, since Plaintiffs admit the accuracy of YPF's disclosures, incorporated into Repsol's statements, they also admit that Repsol repeatedly told investors of *assertions* by certain provinces that YPF was "liable for failing to meet certain concession . . . obligations" (not actual breaches), and that if found liable, YPF could "be at risk of termination . . . ."  YPF, 2010 Form 20-F, cited in Harris Decl. ¶ 23, at 134; *see, e.g.,* YPF, 2009 Form 20-F, cited in Harris Decl. ¶ 16, at 154.

[3] *See* Repsol MTD at 6-7 (alleged mismanagement, if disclosed, cannot support a fraud claim).

As more fully explained below, none of the remaining "facts" that the Opposition maintains should have been disclosed creates any basis for liability against Repsol.[4]

### B. Repsol Admittedly Disclosed The Supposed Motives Alleged in the SAC, Which Were Also Admittedly Immaterial

In the latest episode of Plaintiffs' theory-of-the-month approach to this action, the Opposition argues that Repsol should be liable for "concealing [its] true motives" underlying YPF's fully-disclosed investments and dividends, Opp. at 16. To start, the only allegedly concealed motives were pursuing "unusually high dividends" and "fund[ing] international expansion efforts." SAC ¶ 125(i). The Opposition now concedes that Repsol disclosed all dividends and overseas spending, s*ee supra* I.A, and Repsol cannot be liable on the basis of its disclosed "motives." *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) (affirming dismissal where "allegedly omitted facts" were "disclosed or implied").

The new motive mentioned in the Opposition—to force Argentina to raise oil prices by cutting investments, Opp. at 4, 22[5]—fails for three reasons. First, even if this motive had been alleged, it would be implausible. By admitting that the disclosures of facts as to YPF's investments were accurate, *see id.* at 15, Plaintiffs now admit that YPF *increased* investments to new highs in 2010 and 2011, *see* Repsol MTD at 11—together, the bulk of the class period.

Second, even if this motive had been alleged and were plausible, Section 10(b) does not

---

[4] Plaintiffs rely on a number of cases that pre-date *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), s*ee* Opp. at 11, but *Twombly* leaves no doubt that the Court may dismiss the SAC on its face if the public disclosures render the conclusory allegations in the SAC facially implausible, *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (in assessing plausibility under *Twombly*, a court may consider "statements or documents incorporated into the complaint by reference [and] legally required public disclosure documents filed with the SEC").

[5] Although the Opposition now also argues that Repsol planned to "sell" its interest in *Vaca Muerta*, Opp. at 23, it does not cite this as one of Repsol's "true motives." Nor is this supposed plan a basis for a fraud claim. *See* SAC ¶ 125. On the contrary, the SAC pleads that Repsol *disclosed* the need for "investment . . . from international markets." *See id.* ¶ 142.

impose liability for failing to disclose the "motives in entering a transaction" where the transaction itself has been disclosed.  *See Alabama Farm Bureau Mut. Cas. Co., Inc. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 610 (5th Cir. 1979).  Nor does it impose liability for failing to disclose "motives or subjective beliefs . . . reached from publicly available information," such as the admittedly-disclosed investment levels in this case.  *Id.*

Third, and consistent with this, the Opposition effectively admits that Repsol's "true motives" were immaterial to understanding the risk of nationalization.  In trying to state a claim against YPF, the Opposition argues that YPF "cannot justifiably claim that it lacked knowledge that Repsol's failure to invest in YPF's projects caused a significant decline in oil and gas production, which exacerbated the risk that Argentina would nationalize YPF."  Opp. at 31.  In other words, YPF's investment amounts and declining production—both admittedly disclosed and even detailed throughout the statements quoted in the SAC, *see* ¶¶ 129 ("fall" in production and reserves), 131 (same), 133 (same), 139 (same), 141 (same), 143 (same)—*by themselves* revealed the "exacerbated" risk of nationalization.  Repsol's "true motives" were thus admittedly immaterial to perceiving that risk.  This is particularly true given that numerous press reports explicitly disclosed this risk long before it materialized.

### C.    Repsol Cannot Be Liable For Failing To Pejoratively Characterize YPF's Investment Levels

Plaintiffs argue that Repsol deceived investors by failing to characterize the fully-disclosed amounts of YPF's investment as "grossly inadequate," Opp. at 15, or "insufficient," *id.* at 23.  This strategy fails for two reasons.  First, as discussed, Plaintiffs admit that YPF broke its records for investment in both of the critical years of the class period.  Indeed, these investments admittedly succeeded, resulting in the "major discovery" of the *Vaca Muerta* reserves.  SAC ¶ 11.  Thus, there was no basis to denigrate the investment levels.  Second, Plaintiffs ignore the

6

well-settled principle that "disclosure is not a rite of confession." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) (internal quotation marks and citation omitted). A speaker need not "characterize its behavior in a pejorative manner" if it discloses the facts of the behavior. *Solow*, 2012 WL 1813277, at *4 (internal quotation marks and citation omitted). Here, even if investments fell short (which they did not), Repsol disclosed the exact amounts, as well as those contentions of insufficiency that were received,[6] and thus cannot be liable for failing to call spending inadequate.[7] *See id.*

### D. The SAC Does Not And Could Not Allege That Repsol "Promised" Any Level Of Investment Or Increased Production

Coining yet another new theory, the Opposition argues (falsely) that Repsol made "public promises" to "sufficiently develop [the] *Vaca Muerta*" energy reserves, Opp. at 23, and "to significantly increase domestic energy production in Argentina," *id.* at 15. But the SAC does not make these allegations. *See Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 693 (S.D.N.Y. 2012), *aff'd*, 2013 WL 6644838 (2d Cir. Dec. 18, 2013).

Nor could it: Repsol's *actual* statements quoted in the SAC contained no such promises. *See City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 413 (S.D.N.Y. 2011) (allegation of misstatements "not plausible because it is contradicted by the document on which the plaintiffs rely"). Regarding *Vaca Muerta*, Repsol never promised to spend any particular amount on development, much less to commit whatever was necessary to

---

[6] *See supra* n.2.

[7] Plaintiffs argue that a "literally true statement" can be actionable if it gives investors a "false impression," *see Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)—but that principle does not require pejorative characterization of the admittedly complete and accurate disclosures here of YPF's investment (and production) levels. *E*Trade* involved the alleged omission not merely of characterizations of disclosed facts, but of material data: the fact that the company's mortgage-backed securities portfolio "was largely comprised of high-risk loans, purchased from barrel-scraping subprime lenders with no, or virtually no, due diligence, without tracking current CLTVs [combined loan to value ratio]." *Id.* at 186.

fully exploit the reserves.  *See* SAC ¶¶ 136-37, 139-43.  Rather, Repsol warned of the opposite: that this task "would require a vast investing effort that would reach $25 billion per year" from "international markets," not Repsol alone.  SAC ¶ 142.  Repsol stated merely that it would continue "exploring" and "investigating."  *Id.* ¶ 143.  The SAC does not and could not plead that Repsol had no such intent; in fact, as alleged, exploration continued successfully.  *See* SAC ¶ 91.

As to production and investment, Repsol made only "estimates," not "promises," and the SAC does not allege these "estimates" were fraudulent.  *Compare* SAC ¶ 69(c) (noting Repsol's estimates) *with* ¶¶ 126-31, 133, 136-37, and 139-43 (Repsol's only alleged "materially false and misleading" statements).  The Opposition simply mischaracterizes statements about exploration and investment as being commitments about production, *see, e.g.,* Opp. at 23,[8] and mistakenly attributes Mr. Eskenazi's statements to Repsol.[9]

### E.   Repsol Had No Duty To Make Further Disclosures About The Risk Of Expropriation

The Opposition (i) makes no attempt to dispute, and thus concedes, that Repsol had no non-public knowledge about the Argentine government's plans for YPF; (ii) explicitly admits that Repsol disclosed the "material" risks of "nationalization, expropriation or cancellation of contract rights," Opp. at 19 (citing Repsol MTD at 13), and (iii) reaffirms that, in any event,

---

[8] Paragraph 94 of the SAC alleges that Repsol "sought to reassure the market about the Company's commitment to change its ways and increase . . . domestic exploration and production."  SAC ¶ 94.  However, this characterization is contradicted by the quoted statement on which it is based:  "with the current results, *Argentina* has the *opportunity* to reproduce the revolution in non-conventional hydrocarbons seen in the United Stated [sic] by developing the resources contained in the Vaca Muerta formation."  *Id.* (emphasis added).  Such statement thus did not mention spending by YPF or Repsol at all, or state that Repsol would "commit" to any "increase" in "production."

[9] Repsol never said that it "planned to 'continue investing' in Vaca Muerta," Opp. at 23; *see* SAC ¶¶ 123, 132 (quoting Mr. Eskenazi's statements).  Nor was Repsol responsible for Mr. Eskenazi's or YPF's statements.  Plaintiffs' argument to the contrary as to YPF, *see* Opp. at 14 n. 6, "conflat[es] shareholder control with 'ultimate authority,'" *In re Optimal U.S. Litig.*, No. 10 Civ. 4095 (SAS), 2011 WL 4908745, at *5 (S.D.N.Y. Oct. 14, 2011).

Argentina had a well-known "track record" of expropriating companies, Opp. at 5, and thus concedes that the risk of expropriation was publicly known for years, *see* Repsol MTD at 14-15.

The Opposition's argument that Repsol nonetheless should have characterized the publicly-known risk as "escalating," Opp. at 16, or "imminent," *id.* at 17 n.8, suffers from three flaws.  First, Plaintiffs attribute this risk to the fact that "while publicly pledging to increase investment . . . [Repsol] did the opposite."  Opp. at 19.[10]  As discussed, the Opposition admits this argument is false, because YPF increased investments to record levels in 2010 and 2011.  Second, Repsol never "publicly pledg[ed] to increase investment," Opp. at 19, as noted above.  Thus, Plaintiffs do not plead any broken promise that could have heightened the risk.

Third, Plaintiffs admit that Repsol has no duty to predict Argentina's behavior.  *See* Opp. at 19.  Courts reject claims based on a supposed duty to disclose facts relevant to forecasting a third party's decision, *see In re Bank of America AIG Disclosure Sec. Litig.*, 2013 WL 5878814, at *8-9 (S.D.N.Y. Nov. 1, 2013) (no duty to predict "imminence and amount" of a lawsuit even though defendant entered a tolling agreement with opponent), particularly where the third party is a government entity, *see Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) (no duty "to predict . . . the 'imminent' or 'likely' outcome of [government] investigations" even after receiving a Wells Notice) (citation omitted).  The Second Circuit recently held that a defendant need not even disclose the "likelihood" that a defendant *itself* will cause a particular risk to materialize, even if it previously discussed that risk.  *See Jones v. Perez*, 2013 WL 6800604, at *3 (2d Cir. Dec. 26, 2013) (rejecting argument that "defendants, having chosen to speak on the issue of bankruptcy, were under a continuing duty to disclose the

---

[10] The Opposition erroneously states that Repsol argues it had "no duty to disclose the risk of nationalization in the first place."  Opp. at 18.  Repsol's actual argument was that it had no duty "to predict the Argentine government's future behavior," Repsol MTD at 16, much less say more than it already did about the risk of a takeover.

likelihood of bankruptcy").  Much less could Repsol bear any duty to gauge the "likelihood" of a third party's decision.[11]

## II.    THE OPPOSITION DISPROVES PLAINTIFFS' THEORIES OF SCIENTER

### A.    The SAC's Alleged Motive Is Admittedly Implausible

Critically, the Opposition has abandoned the SAC's motive allegations:  to earn dividends, and to sell small blocks of YPF shares at inflated prices, knowing that these activities increased the risk of expropriation.  *See* SAC ¶ 157.  The Opposition discards this theory because it is patently illogical, as it would require Repsol intentionally to jeopardize its majority share of YPF, worth an eleven-figure sum, to earn tiny fractions of that amount in dividends and divestitures.[12]  It is well-settled that courts may reject allegations that presume an irrational motive.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest.") (citing *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does

---

[11] None of the authority cited by Plaintiffs holds that a defendant has a duty to comment on the likelihood that a disclosed risk will come to pass, when the materialization of the risk is dependent on the decision of a third party.  *See* Opp. at 19-20 (citing cases); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 6621024, at *27-28 (S.D.N.Y. Dec. 12, 2013) (duty to correct boasts about own trading platform given awareness of defects in platform); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 479 n.157 (S.D.N.Y. 2010) (duty to disclose own admitted breach of accounting provisions of joint operating agreement).  Moreover, in *Sgalambo*, plaintiffs did not allege that the market was aware of any problems with the agreement at issue (of which defendants made positive statements), whereas here, Plaintiffs admit the market knew of the risk of expropriation.  Thus, here, silence about the relevant risk cannot plausibly have been misleading.

[12] As to the inference of scienter, the Opposition proposes a "tie goes to the plaintiff" pleading standard that is not the law.  Instead, under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the SAC can survive only if Plaintiffs establish that a reasonable person "would" infer that Repsol "acted with the required intent."  551 U.S. 308, 323 (2007).  This "asks what a reasonable person *would* think" is more likely, "not a reasonable person *could* think."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239 (11th Cir. 2008) (emphasis in original); *accord S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110-11 (2d Cir. 2009).

not yield a reasonable inference of fraudulent intent.")); *see also S. Cherry,* 573 F.3d at 110

(affirming dismissal based on "common sense" review of allegations).[13]

Instead, a discussed, the Opposition swaps in a new motive: to drive up oil prices and

then "stall" nationalization by making announcements about the *Vaca Muerta* formation when in

reality "Repsol had no real intent of increasing its domestic investments or activities." Opp. at

27. But this motive is neither alleged as driving the fraud nor plausible, and for all the reasons

discussed above cannot save the SAC from dismissal. *See supra* I.C.

> **B.    Repsol Was Not Reckless In Failing to Predict The Expropriation As The Opposition Cites No Non-Public Information Available To Repsol About the Risk of Expropriation**

To plead "strong circumstantial evidence of conscious misbehavior or recklessness," a

plaintiff must allege "specific facts showing that Defendants had access to information

contradicting their public statements." *Medis Investor Grp. v. Medis Techs., Ltd.*, 586 F. Supp.

2d 136, 147-48 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). Here, like the

SAC, the Opposition fails to identify any such "facts or information." For example, the

Opposition regurgitates the Mosconi Report's accusations that Repsol engaged in a "systematic

disinvestment . . . in Argentina with the explicit goal of 'reducing its exposure to risk in

[Argentina],'" Opp. at 29, but the quoted portions address Repsol's ***publicly-disclosed*** conduct:

Repsol's dividends and "global expansion" efforts, the supposed "abandonment of YPF's

---

[13] The authority cited in the Opposition confirms that motive allegations of "tenuous plausibility" should be dismissed. *In re GeoPharma, Inc.*, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006). The other cases on which Plaintiffs rely (most of which pre-date the controlling standard of *Tellabs* and *S. Cherry*) involve allegations that parties acted in their own economic self-interest, not that they knowingly jeopardized their most valuable investments. *See* Opp. at 27-28; *In re Cabletron Sys. Inc.*, 311 F. 3d 11, 39, 24 (1st Cir. 2002) (alleging discovery of "[a]ccounting shenanigans" and a resulting motivation to sell shares "before the worst of the news was out"); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1003-04 (S.D. Ohio 2007) (alleged motive to offload securities after defendant underwriter discovered issuer's fraud).

exploration . . . activities," and "systematic . . .  underinvestment," the exact amounts of which were each admittedly disclosed.  Opp. at 29; *see supra* I.A.

Similarly, the Opposition falsely describes paragraphs 51, 57, and 90 of the SAC as alleging "numerous communications between Repsol and the Argentine government where . . . YPF's lack of oil and gas production were discussed."  Opp. at 30.  Paragraph 90 quotes a ***public*** announcement by Argentine officials criticizing YPF, but makes no mention of any government communications with Repsol, *see* SAC ¶ 90; Harris Decl. ¶ 25 & Ex. M.[14]  Paragraphs 51 and 57 "specifically identify" no non-public communication between Repsol and Argentina (*i.e.*, date, participants, means, contents), *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see* SAC ¶ 51 (referring to Argentina's "concerns" during a seven-year period); *id.* ¶ 57 (referring to an undated warning to unnamed individuals at YPF—not Repsol—by unstated means).

## III.   THE OPPOSITION DISPROVES CAUSATION

### A.   Repsol's Early 2012 Statements Cannot Have "Reassured" Lead Plaintiff About The Risk of Expropriation

In arguing that Lead Plaintiff relied on Repsol's supposed omissions even though long before his April 2012 purchases (a) numerous reports of imminent expropriation risk for YPF appeared in the press, Underwriters' Mot. to Dismiss at 2, and (b) Argentina publicly criticized YPF and its investment levels, both causing its share price to drop, *see* SAC ¶¶ 89, 93, the Opposition argues that "the market contained mixed messages and uncertainty concerning the risks of nationalization," Opp. at 35.  However, putting aside that the essence of risk is its uncertainty, Plaintiffs admit that Repsol did not address the risk of nationalization at all in its

---

[14] The cases cited by Plaintiffs are thus inapposite.  *See, e.g.*, *Sgalambo v. McKenzie*, Amended Complaint ¶ 53, 2010 WL 3060604 (S.D.N.Y. Apr. 30, 2010) (admitted knowledge that company could not meet its obligations under joint operating agreement); *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (alleging access to reports that "showed that some of Dana's factories were not meeting their budgets," contradicting defendant's statements).

early 2012 statements; indeed, Repsol "*neither confirmed nor denied*" the rumors of a possible

takeover.  *Id.* at 34 (emphasis added).  And even if a statement about production (rather than

expropriation) were relevant, Repsol did not promise it would "increase production in Vaca

Muerta," as the Opposition argues.  Opp. at 34; *see supra* I.D.  On the contrary, as the SAC itself

demonstrates, Repsol **disclaimed** any commitment independently to develop the *Vaca Muerta*

reserves.  *See supra* I.D; SAC ¶ 142.  Repsol's statements thus cannot plausibly have "reassured"

Lead Plaintiff about the widely-discussed risk of expropriation based on inadequate production:

if anything, failure to **deny** the takeover rumors should have given Lead Plaintiff **more** concern.

### B.   The Only Allegedly Concealed "Facts" Admittedly Were Not Revealed Until After The Losses Occurred And Thus Could Not Have Caused The Losses

Now that Plaintiffs have admitted the disclosure of the vast majority of alleged

"omissions" prior to their losses, they face an even greater challenge in pleading loss causation:

> [W]here (as here) substantial indicia of the risk that materialized are
> unambiguously apparent on the face of the disclosures alleged to conceal the very
> same risk, a plaintiff must allege (i) facts sufficient to support an inference that it
> was defendant's fraud—rather than other salient factors—that proximately caused
> plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed
> and concealed portions of the risk that ultimately destroyed an investment.

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174-75, 177 (2d Cir. 2005).

Plaintiffs cannot meet the *Lentell* standard because Repsol admittedly disclosed YPF's

exact levels of "invest[ment] in" and "develop[ment of] domestic oil and gas projects," Opp. at

36, **before** Plaintiffs suffered any alleged losses, *see* Repsol MTD at 11-12.[15]  And far from

---

[15] In defending their contradictory causation allegations—Repsol supposedly mismanaged YPF, but the share price fell upon the consequent expropriation announcement—the Opposition argues that "investors would not view a government takeover of a public company as a positive development, particularly where the government explained that the takeover resulted from a defendant's misconduct."  But as a matter of logic, an intervention to *stop* misconduct should increase share value.  The Opposition also attempts to bar the Court's recognition of Argentina's breach of its contractual duty to make a tender offer to Plaintiffs and their asserted class, which would have assured compensation at a pre-expropriation price before any losses occurred.  *See*

alleging facts showing that the "concealed portions" of the risk caused Plaintiffs' losses, *Lentell*, 396 F.3d at 177, Plaintiffs admit that the only remaining "omissions"—Repsol's supposed "true motives," Opp. at 16—were first uncovered in the Mosconi Report and "audit," both coming months *after* Argentina announced the takeover in April 2012.[16]  *See* Opp. at 50-51.

Moreover, even if some unknown motive could have triggered the expropriation, the SAC pleads the opposite:  that Repsol's *actions* caused the government to act.  Argentina allegedly seized YPF because of its "lack of production and investment in Argentina."  SAC ¶ 63.  Thus, according to the SAC, it does not matter whether Repsol acted out of a "*deliberate* '*strategy* of depredation, disinvestment and failure to appropriately supply the domestic market,'" Opp. at 50-51 (emphasis added) (quoting SAC ¶ 65), or out of a sincere belief that investments were sufficient.  The "salient" factors that "caused [Plaintiffs'] loss" (*i.e.*, YPF's investments and dividends) were admittedly disclosed before the loss occurred.  *Lentell*, 396 F.3d at 177.  In other words, the "what," not the "why," allegedly caused Plaintiffs' losses.  Because they now admit that only the "why" was supposedly concealed, they fail adequately to plead loss causation.[17]

---

Opp. at 38; *Repsol YPF, S.A., et al. v. Republic of Arg.*, No. 12 Civ. 3877 (S.D.N.Y.) (TPG).  But the Court may take judicial notice of the Bylaws Action in deciding Repsol's motion.  *See Schenk v. Citibank/Citigroup/Citicorp*, No. 10 Civ. 5056 (SAS), 2010 WL 5094360, at *2 (S.D.N.Y. Dec. 9, 2010) (proper to take judicial notice of "other lawsuits").

[16] Combining this alleged scheme with the admitted facts, the result is a supposed scheme to under-invest to drive up prices that necessarily *ended* at the end of 2009, when Repsol, under the Horizon 2014 Plan, began supporting YPF's decisions to invest at historic levels in 2010 and 2011.  Thus, even if the scheme were plausible, it cannot plausibly have caused Plaintiffs' losses, because it ended prior to the start of the class period (the very end of 2009, *see* SAC ¶ 1).

[17] In *In re Parmalat Securities Litigation*, 375 F. Supp. 2d 278, 284 (S.D.N.Y. 2005), the plaintiffs alleged that defendants concealed "something akin to a Ponzi scheme."  When the defendants ran out of cash, the scheme "collapse[d]," allegedly causing plaintiffs' losses.  *Id.* at 284.  Thus, the allegedly-concealed *facts*—accurate financial statements and the existence of a Ponzi scheme—caused plaintiffs' losses.  In contrast, here, the only hidden information (motives) played no alleged role in the causal chain.

14

## IV.  THE SECURITIES ACT CLAIMS ARE UNTIMELY

For the reasons fully set forth in the Underwriters' Reply Memorandum of Law, the Opposition confirms Plaintiffs' Securities Act claims are untimely, even based on their own theory.  Moreover, the Opposition also concedes (i) Plaintiffs never asked Repsol for permission to amend, (ii) Plaintiffs did not share a draft of the proposed amendment with Repsol, and (iii) Plaintiffs never sent any pre-motion letter to Repsol.  *See* Opp. at 40 (describing stipulation and not attempting to argue that Plaintiffs otherwise contacted Repsol).  Thus, although as the Underwriters explain these steps would have been legally irrelevant anyway, Plaintiffs did not even make these inadequate attempts, or any attempts whatsoever, as to Repsol by August 14.[18]

### CONCLUSION

Repsol respectfully requests that the Court grant Repsol's Motion to Dismiss.

Dated:  January 10, 2014
New York, NY

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ Christopher R. Harris
Miles N. Ruthberg
James E. Brandt
Christopher R. Harris
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Attorneys for Defendant Repsol, S.A.*

---

[18] Nor did Repsol participate in the Offering as a "partner" of YPF merely because Repsol worked "in cooperation" with YPF on research activities.  Opp. at 39 n. 14; *see In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 172 (S.D.N.Y. 2012) (equating the term "partner" with "director," implying a much higher level of involvement than mere business "cooperation").  Courts reject liability for defendants who would qualify as "partners" under Plaintiffs' analysis, including selling shareholders who allegedly control the issuer, *see Batwin v. Occam Networks, Inc.*, 2008 WL 2676364 (C.D. Cal. July 1, 2008), as well as an issuer's consultants, *In re Prestige Brands Holding, Inc.*, 2006 WL 2147719 (S.D.N.Y. July 10, 2006).