UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MONROE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Individually and On
Behalf of All Others Similarly Situated,

                Plaintiff,

      v.

YPF SOCIEDAD ANONIMA, et al.,

                Defendants.

Civil Action No. 1:13-cv-0842 (SAS)

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THE UNDERWRITER DEFENDANTS' MOTION
TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT**

Dated:  January 10, 2014

O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000

*Attorneys for Defendants Morgan Stanley &
Co. Incorporated, Credit Suisse Securities
(USA) LLC, and Goldman, Sachs & Co.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.    The Limitations Period Started Running When the Allegedly Omitted Risk of Nationalization Was Disclosed to the Market in Early 2012, Not When the Mosconi Report Tried to Justify the Nationalization in Hindsight. ................. 3

    A.    The Securities Act Claims Are Untimely Under Any Formulation of the Statute of Limitations Standard. ...................................................... 3

    B.    The Mosconi Report Did Not Reveal Anything New. .............................. 4

    C.    Markovic Cannot Avoid the Consequences of the Early 2012 Press Reports. ..................................................................................................... 7

II.    The Securities Act Claims Would Be Untimely Even If the Limitations Period Were to Run from April 16, 2012. ......................................................... 11

    A.    Delaying the Commencement of the Limitations Period Until the April 16, 2012 Nationalization Would Still Require that Markovic Had Brought His Securities Act Claims by August 14, 2013. ................. 11

    B.    Markovic Did Not Bring His Securities Act Claims by August 14, 2013, and Is Not Entitled to Equitable Tolling for His Delay. ............... 12

III.    The Securities Act Claims Are Untimely Even If the Limitations Period Did Not Begin to Run Until the June 1 Publication of the Mosconi Report Because Markovic Is Not Entitled to *American Pipe* Tolling. ........................... 14

CONCLUSION ........................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.*,
2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010)........................................................ 10

*Amorosa v. AOL Time Warner, Inc.*,
409 F. App'x 412 (2d Cir. 2011) .......................................................................... 9

*Andrews v. Metro North Commuter R.R. Co.*,
882 F.2d 705 (2d Cir. 1989)................................................................................ 10

*Brecher v. Citigroup Inc.*,
797 F. Supp. 2d 354 (S.D.N.Y. 2011).............................................................. 9, 10

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)................................................................................ 14

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)................................................................................ 5

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2012).................................................................. 8

*Freidus v. Barclays Bank PLC*,
734 F.3d 132 (2d Cir. 2013).............................................................................. 4, 9

*Giovanniello v. ALM Media, LLC*,
726 F.3d 106 (2d Cir. 2013)................................................................................ 15

*Glatt v. Fox Searchlight Pictures Inc.*,
2013 U.S. Dist. LEXIS 82079 (S.D.N.Y. June 11, 2013).................................... 13

*Guzman v. Macy's Retail Holdings, Inc.*,
2010 WL 1222044 (S.D.N.Y. Mar. 29, 2010) .................................................. 6,7

*Hoi Ming Michael Ho v. Duoyuan Global Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012).................................................................. 9

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012).................................................................. 8

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................................. 6

*In re Donna Karan Int'l Sec. Litig.*,
1998 WL 637547 (E.D.N.Y. Aug. 14, 1998)........................................................ 6

**TABLE OF AUTHORITIES**
(continued)

Page

*In re IndyMac Mortg.-Backed Sec. Litig.*,
  793 F. Supp. 2d 637 (S.D.N.Y. 2011)....................................................................... 3

*In re Initial Pub. Offering Secs. Litig.* ,
  227 F.R.D. 65 (S.D.N.Y. 2004) ............................................................................ 15

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003)....................................................................... 6

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  810 F. Supp. 2d 650 (S.D.N.Y. 2011)....................................................................... 9

*In re PXRE Grp., Ltd. Secs. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009)................................................................. 10, 11

*Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*,
  902 F. Supp. 2d 329 (S.D.N.Y. 2012)....................................................................... 9

*Merck & Co. v. Reynolds*,
  130 S. Ct. 1784 (2010)............................................................................................. 3

*N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC*,
  720 F. Supp. 2d 254 (S.D.N.Y. 2010)....................................................................... 8

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*,
  2013 WL 620257 (S.D.N.Y. Feb. 15, 2013)........................................................... 3, 4

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)....................................................................... 3

*Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization
  Transactions, Inc.*,
  730 F.3d 263 (3d Cir. 2013).................................................................................... 9

*Perry v. Duoyuan Printing, Inc.*,
  2013 WL 4505199 (S.D.N.Y. Aug. 22, 2013)..................................................... 14, 15

*Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan
  Acceptance Corp.*,
  2012 WL 601448 (E.D.N.Y. Feb. 23, 2012)............................................................. 8

*Poindexter v. EMI Record Grp. Inc.*,
  2012 U.S. Dist. LEXIS 42174 (S.D.N.Y. Mar. 27, 2012) ....................................... 11

*Polanco v. City of N.Y. Dep't of Corr.*,
  2002 WL 272401 (S.D.N.Y. Feb. 26, 2002).......................................................... 5

## TABLE OF AUTHORITIES
### (continued)

Page

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
    898 F. Supp. 2d 673 (S.D.N.Y. 2012)................................................................... 5

*Reza v. Khatun*,
    2013 WL 596600 (E.D.N.Y. Feb. 15, 2013)......................................................... 13

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................................... 12

*Shepherd v. Powers*,
    2012 U.S. Dist. LEXIS 141179 (S.D.N.Y. Sept. 27, 2012)................................. 10

*Siebert v. Nives*,
    871 F. Supp. 110 (D. Conn. 1994)......................................................................... 9

*Softview Computer Prods. Corp. v. Haworth, Inc.*,
    1999 WL 1225254 (S.D.N.Y. Dec. 20, 1999) ...................................................... 12

## Other Authorities

15 U.S.C. § 77m.............................................................................................................. 4

28 U.S.C. § 1658(b) ........................................................................................................ 3

# PRELIMINARY STATEMENT[1]

Markovic has repeatedly maintained that the statute of limitations on his Securities Act claims began to run when Argentina announced that it was sending its expropriation bill to Congress on April 16, 2012.[2] The Underwriters then demonstrated in their opening brief that this position is:

- untenable in light of (i) the numerous press reports in January, February, March, and early April 2012 discussing the increasing nationalization risk because of the Argentine government's dissatisfaction with YPF's failure to invest in domestic oil and gas development; and (ii) Lead Plaintiff's and Markovic's admissions that the January 30 and February 29 reports were corrective disclosures that revealed the allegedly omitted information to the market and caused YPF's stock price to fall; and

- legally insufficient because (i) Markovic did not, in any event, bring his claims by April 16, 2013, and was not entitled to bridge the gap using *American Pipe* tolling; and (ii) even assuming *American Pipe* tolling applied for the 120 days the *Monroe County* complaint was on file, Markovic did not even bring his claim within 120 days of April 16, 2013, by August 14, 2013.

In apparent recognition that using the April 16 date sinks his complaint under the Securities Act's statute of limitations, Markovic now takes an even more absurd position: that investors could not have known the allegedly omitted risk of nationalization until *six weeks after* YPF was nationalized, when the government provided its justifications in the June 1, 2012 Mosconi

---

[1] The Underwriters use the same defined terms here as used in their Memorandum of Law in Support of the Underwriter Defendants' Motion to Dismiss the Second Consolidated Amended Complaint, which is cited as "UWM." Markovic's opposition brief is cited as "Opp." Unless otherwise noted, this memorandum adds any emphasis reflected in quoted passages and omits all internal citations, quotation marks, and original alterations.

[2] *See* SCAC ¶ 99 ("[O]nly on April 16, 2012 were YPF investors on notice that YPF's previous public statements that the Company was increasing its commitment to domestic energy exploration were materially false and misleading and misrepresented the risk of nationalization."); Pls.' Aug. 23, 2013 Ltr. at 2 (investors had "constructive notice of the claim" by "April 16, 201[2], the day that nationalization was announced," and therefore "investors had until April 16, 2013, to file a Securities Act claim based on the Offering"); Pls.' Aug. 30, 2013 Ltr. at 3 ("Absent any tolling, investors had until April 16, 2013 to file their Securities Act Claims based on the March 23, 2011 Offering."); August 27 Tr. at 16:19-20 ("The cutoff date was April 16."); August 20 Tr. at 5:14–15 ("Our claim actually ends on April 16th of 2012.").

Report.  This Hail Mary not only contradicts the SCAC and Markovic's serial judicial admissions, it is insufficient to save his untimely Securities Act claims.[3]

*First*, the limitations period started in early 2012 when the press reported that YPF's nationalization risk had increased because the Argentine government believed that YPF's domestic-investment levels were too low.  The Mosconi Report did not reveal new material facts about this political dispute but merely discussed and evaluated YPF's motives for its (undisputedly disclosed) domestic-investment levels and used pejoratives to describe YPF's domestic-investment activity.  Investors had understood for months that Argentina was unhappy that YPF was spending its profits on dividends rather than investing in Argentine energy development.  The Mosconi Report's gloss on those facts was not new material information.

*Second*, even (i) accepting the SCAC allegation that the limitations period did not begin to run until the nationalization was formally announced on April 16, 2012, and (ii) assuming *American Pipe* tolling for the entire 120 days the *Monroe County* complaint was pending, Markovic did not meet his August 14, 2013 deadline to bring Securities Act claims.  Markovic provides no explanation for his failure to file (or seek the Court's leave to file a motion to amend) by that date and does not even attempt to satisfy his high burden to prove that "extraordinary circumstances" justify equitable tolling.

*Third*, even if Markovic's new June 1, 2012 theory were valid, his Securities Act claims would still be untimely because, for two independent reasons, he has not established entitlement to *American Pipe* tolling based on the *Monroe County* complaint: (i) he has not even *alleged*, much less established, that he reasonably relied on the *Monroe County* complaint to delay bringing his own action, nor would any such reliance have been reasonable because it was

---

[3] The claims also fail on the merits, as explained in YPF's and Repsol's reply briefs, which the Underwriters join.

obvious from the face of Monroe County's complaint that it lacked standing to pursue Securities

Act claims; and (ii) the voluntary dismissal of that complaint rendered it a legal nullity.

## ARGUMENT

**I.    The Limitations Period Started Running When the Allegedly Omitted Risk of Nationalization Was Disclosed to the Market in Early 2012, Not When the Mosconi Report Tried to Justify the Nationalization in Hindsight.**

### A.    The Securities Act Claims Are Untimely Under Any Formulation of the Statute of Limitations Standard.

Markovic argues that his Securities Act claims are timely under *Merck & Co. v.*

*Reynolds*, 130 S. Ct. 1784 (2010), which holds that the limitations period for an Exchange Act

claim does not begin until a plaintiff can discover enough facts to plead all elements of a claim.

(*See* Opp. at 41–42.)  But "[t]he majority of courts in this district [have] declined to apply *Merck*

to Section 11 claims."  *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341,

364 (S.D.N.Y. 2012).  These courts correctly recognize that *Merck* was "based on the precise

language of" the Exchange Act's limitations provision.  *In re IndyMac Mortg.-Backed Sec.*

*Litig.*, 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011).  That provision is triggered by "discovery of

the facts constituting the violation," 28 U.S.C. § 1658(b), which for an Exchange Act claim

requires more than just facts supporting the alleged misstatement or omission (*e.g.*, scienter that

needs to be pleaded with particularized facts under the PSLRA).  By contrast, the Securities

Act's limitations provision runs from discovery of the omission itself (or when it should have

been discovered).  Courts have recognized that this distinction matters, because "determining

when the plaintiff should have uncovered an untrue assertion in a registration statement or

prospectus is much simpler than assessing when a plaintiff should have learned that the

defendant deliberately misled him using a deceptive device covered by [the Exchange Act]."  *Pa.*

*Pub. Sch. Emps.' Ret. Sys.*, 874 F. Supp. 2d at 365; *see also NECA-IBEW Pension Trust Fund v.*

*Bank of Am. Corp.*, 2013 WL 620257, at *7 (S.D.N.Y. Feb. 15, 2013) ("Given the difference in

the language of the two statutes of limitations, the logic of those Judges that have concluded that

*Merck* does not extend to actions brought under the Securities Act is compelling.").

The simplicity of the Securities Act's pleading requirements is reflected in its "Limitation

of actions" provision, under which the limitations period begins to run immediately upon

constructive discovery "of the untrue statement or the omission."  15 U.S.C. § 77m.  *See also*

*Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 (2d Cir. 2013) (applying this statutory

language in affirming dismissal of Securities Act claims on limitations grounds).  As Markovic

notes (Opp. at 42, n.16), the Second Circuit in *Freidus* did not address *Merck* because the trial

court had properly held that the limitations period begins under Section 77m once the allegedly

omitted information enters the market, regardless of whether *Merck* applies.  *See* 734 F.3d at

138, n.2.

The same is true here.  Markovic's Securities Act claims are premised only on allegations

of a material misstatement or omission in the offering documents.  The alleged Registration

Statement omission on which Markovic relies is the "increased" risk of nationalization because

of the Argentine government's dissatisfaction with YPF's failure to invest domestically.  (*See*

SCAC ¶¶ 73, 79, 89, 93.)  Once Markovic knew or should have known about that risk, the

limitations period began.  As the Underwriters have overwhelmingly shown (*see* UWM at 7–10),

investors had notice of that risk no later than early 2012.

B.      **The Mosconi Report Did Not Reveal Anything New.**

Markovic argues for the first time that until Argentina issued the Mosconi Report,

reasonably diligent investors could not have learned the three "facts" he alleges were omitted

from the offering documents: (1) YPF was paying high dividends to shareholders (primarily

Repsol) rather than investing its profits in developing Argentina's oil resources; (2) YPF's

-4-

domestic-development levels "increased the risk that the Company would be nationalized"; and (3) various Argentine provinces considered YPF's domestic-development levels to constitute a breach of YPF's concession contracts with those provinces. (*See* Opp. at 43.) But Markovic admits that these facts were publicly disclosed long before the Argentine government published the Mosconi Report, *pleading in his complaint* that by April 16, 2012, "YPF investors [were] on notice that YPF's previous public statements that the Company was increasing its commitment to domestic energy exploration were materially false and misleading and misrepresented the risk of nationalization." (SCAC ¶ 99.) He is bound by that admission. *See, e.g.*, *Polanco v. City of N.Y. Dep't of Corr.*, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) (granting motion to dismiss because "Plaintiff is bound by the allegations of his Amended Complaint"). *See also Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 693 (S.D.N.Y. 2012) ("[P]laintiffs may not amend the pleadings yet again by articulating in their papers in opposition to a motion to dismiss their third complaint in this action a brand-new theory."), *aff'd*, 2013 WL 6644838 (2d Cir. Dec. 18, 2013). And in any event, his argument is refuted by the public record.

**YPF's High Dividends.** Markovic does not dispute that YPF's dividend and investment levels were public. (*Compare* UWM at 7 (discussing YPF's dividend disclosures), *and* Repsol Br. at 12 (demonstrating that YPF disclosed dividend amounts and policy of distributing 90% of profits as dividends), *with* Opp. at 15 (conceding that YPF accurately disclosed these figures).) Argentina's opinion, expressed in the Mosconi Report, that YPF was wrong in "deliberately" choosing to pay dividends rather than invest further in Argentina (Opp. at 43) is irrelevant; the Securities Act only requires the disclosure of facts. *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011) (explaining that securities laws only require disclosure of "material

objective *factual* matters").  Having disclosed the facts, YPF had no duty to characterize them

with Markovic's (or Argentina's) chosen adjectives.[4]  Moreover, no investor could believe that

YPF's decisions about how much to invest in domestic-energy development and pay in

dividends were accidental; the Company was obviously acting "deliberately."  *See* Oxford

Dictionary (defining "deliberately" as "consciously and intentionally; on purpose").  Argentina's

pejorative spin was not necessary for investors to have constructive knowledge of the facts.

**YPF's Investment Levels Increasing the Risk of Nationalization.**  Markovic does not

dispute that YPF consistently and accurately disclosed the exact amounts of its investments in

exploration and production.  (*Compare* Repsol Br. at 11 (describing YPF's disclosures of

investment levels, including dollar amounts), *with* Opp. at 15 (conceding that YPF accurately

disclosed these figures).)  And early 2012 press reports repeatedly disclosed that the Argentine

government considered those amounts insufficient, potentially justifying nationalization.  (*See*

UWM at 7–10.)  The Mosconi Report's subsequent negative characterization of YPF's dividend-

over-investment course provided no new material information to the market.

**Breaches of YPF Concession Contracts.**  As Defendants have shown (*see id.* at 7;

Repsol Br. at 13), the SCAC fails to identify any concession contract that any Argentine

province considered YPF to have breached at the time of the Registration Statement.  Markovic

does not address this argument and therefore implicitly concedes it.  *See Guzman v. Macy's*

---

[4] *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)
(rejecting claim based on failure to disclose revenues allegedly derived from "unsustainable and
illegitimate sources," because "the federal securities laws do not require a company to accuse
itself of wrongdoing"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d
351, 378 n.59 (S.D.N.Y. 2003) ("Indeed, the securities laws do not require disclosure of any
particular adjective when the overall message of caution is communicated to investors."), *aff'd in
relevant part, rev'd in part sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir.
2005); *In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, at *10 n.9 (E.D.N.Y. Aug. 14,
1998) ("[T]he securities laws do not require corporate management to direct conclusory
accusations at itself or to characterize its behavior in a pejorative manner.").

*Retail Holdings, Inc.*, 2010 WL 1222044, at *8 (S.D.N.Y. Mar. 29, 2010) (finding waiver where plaintiff "[did] not address [defendant's] argument in her opposition brief"). But even if the SCAC had contained a well-pleaded allegation that the Registration Statement omitted concession-contract breaches, that claim too would be time-barred. As Repsol demonstrates, YPF had been disclosing the possibility of terminated concession contracts as far back as 2009. (*See* Repsol Reply at 4, n.2.) Moreover, the press reported well before the June 1 Mosconi Report that more Argentine provinces were claiming that YPF's development levels caused it to breach concession contracts: (i) an analyst covering YPF noted on March 12, 2012, that at least five Argentine provinces were "complaining of insufficient investment and production," and "warn[ing] of the possibility of removing concessions" (Ex. O); and (ii) Bloomberg reported on April 3 that all five provinces had stripped YPF of "12 licenses to operate oil fields" and were considering more concession revocations (Ex. J). (*See also* Exs. H, I, M (additional articles reporting revocations).) The Mosconi Report adds nothing to the mix.

### C. Markovic Cannot Avoid the Consequences of the Early 2012 Press Reports.

As the Underwriters have shown, the numerous early 2012 press reports about the increasing nationalization risk render Markovic's Securities Act claims untimely, even with full *American Pipe* tolling from *Monroe County*. (*See* UWM at 7–11.) None of Markovic's three responses saves his claims.

*First*, Markovic complains that the early 2012 press reports did not establish that YPF *would be* nationalized, but merely publicized the "elevated risk that YPF might be nationalized." (Opp. at 44–46.) It is precisely the "elevated risk," however, that was allegedly omitted from the 2011 offering documents. (*See, e.g.*, SCAC ¶ 73 (alleging that Registration Statement failed to disclose risk of nationalization arising from Argentine government's dissatisfaction with YPF's failure to produce oil and gas adequately within Argentina and its distribution of profits to

shareholders in high dividends, rather than investing those profits in operations); ¶ 79 (alleging omission that "YPF failed to invest domestically, which increased the risk that the Company would be nationalized").)  The four RMBS cases Markovic cites rejecting a statute-of-limitations defense (*see* Opp. at 46–47) are not applicable here because, whatever their merits, those cases involved only generalized press reports about problems in the RMBS industry.[5]  The press reports the Underwriters cite, by contrast, specifically discuss *YPF*, the issuer of the securities, and the Argentine government's discussions about nationalizing *YPF* because of *YPF's* failure to invest in domestic oil and gas development.  (*See* Exs. A–O.)

*Second*, Markovic contends that YPF's and Repsol's supposed general reassurances about future domestic development superseded investors' knowledge of Argentina's dispute with YPF and the increased nationalization risk.  (*See* Opp. at 47–50.)  But Markovic fails to refute the Underwriters' showing that none of the alleged reassuring statements mentioned the Argentine government dispute or nationalization.  (*See* UWM at 16–18.)  That critical difference

---

[5] *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 764 (S.D.N.Y. 2012) (reports about "general, industry-wide practices" in RMBS industry did not trigger limitations period because they were "untethered to the transactions" at issue and "unconnected to any of the entities that were involved in the origination, packaging, and sale of" the relevant securities); *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 321 (S.D.N.Y. 2012) (limitations period not triggered by news stories that "may have signaled a potential for problems in the RMBS market generally" but did not refer to securities at issue); *Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp.*, 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012) (limitations period not triggered by reports of rising subprime default rates that did not "refer to the offerings, the Certificates, or tie the originators to securities offered by the defendants"); *N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC*, 720 F. Supp. 2d 254, 267 (S.D.N.Y. 2010) ("publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators" insufficient to commence limitations period because "[n]one of the articles [we]re directly related to the [securities] specifically at issue").

distinguishes the cases on which Markovic relies (Opp. at 49), all of which involved reassurances that discussed the alleged misinformation.[6]

More importantly, YPF's and Repsol's optimistic 2012 statements about future Argentine energy development say nothing about whether the Registration Statement omitted *in 2011* information about YPF's nationalization risk. *See, e.g.*, *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 345 (S.D.N.Y. 2012) (Securities Act claim requires statement "false at the time," not deemed so "[w]ith the benefit of hindsight"). Investors were clearly on notice of that alleged 2011 omission in early 2012, even if YPF was trying at that time to reassure investors about *the future*. In any event, Markovic simply ignores the Underwriters' showing that it was reported the week after the March 29, 2012 final supposed reassuring statement that the Argentine government was determined to nationalize YPF (causing YPF's stock to fall nearly 20%). (*See* UWM at 18.)

*Third*, Markovic complains that the January 30 and February 29 reports were not sufficiently corrective to give him constructive notice of the omission. (*See id.* at 13–15.) Markovic first argues that in each of the three cases the Underwriters cite—*Amorosa v. AOL Time Warner, Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011); *Freidus*, 734 F.3d at 138; and *Brecher*

---

[6] *See Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 277-78 (3d Cir. 2013) (defendant provided "reassurances that *the particular loans* underlying its specific Certificates were not afflicted"); *Hoi Ming Michael Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 566 n.11 (S.D.N.Y. 2012) (plaintiffs on notice of omissions regarding accounting problems were reassured when defendant detailed precise steps it was taking to "classify our expenses to conform to U.S. GAAP"); *Siebert v. Nives*, 871 F. Supp. 110, 115 (D. Conn. 1994) (Exchange Act case in which plaintiffs were reassured about undisclosed problems with defendant's loan loss reserves when defendant announced in annual report that it "had already revised its loan policy to address the FDIC's concerns"). Markvoic also cites *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650 (S.D.N.Y. 2011), where the court did not point to any particular "reassurance" that over-rode the cited disclosures but instead held that the disclosures did not put the plaintiff on notice of his claim. *See id.* at 665 ("The cited articles and report were not specifically about Morgan Stanley and were therefore too general to provide inquiry notice.").

*v. Citigroup Inc.*, 797 F. Supp. 2d 354, 367 (S.D.N.Y. 2011)—there was a more specific nexus between the allegedly false or misleading information and the corrective disclosure.  (*See* Opp. at 51.)  But the SCAC alleges that the omission was YPF's low level of domestic investment and consequent increased risk of nationalization (*see* SCAC ¶¶ 73, 79, 89, 93), and that is precisely the information discussed in the January 30 and February 29 press reports (*see* Opp. at 52 (acknowledging that price drops in response to early 2012 disclosures "reflect[ed] investors' concerns about nationalization")).  Markovic also relies on his lawyers' artful pleading in avoiding the term "corrective disclosure" in the CAC and SCAC.  (*Id.*)  But regardless of label, Markovic alleges that the reports revealed previously undisclosed information and caused the stock price to decline in response.  (SCAC ¶¶ 89, 93.)  That is the essence of a corrective disclosure.  *See Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.*, 2010 WL 3910211, at *5 (S.D.N.Y. Sept. 30, 2010) ("[A] corrective disclosure [is] a statement that served to reveal to the market the falsity of prior [statements] followed by a drop in the relevant stock's price.").

Moreover, Markovic is bound by Lead Plaintiff's more explicit allegations in the CAC— claimed to be supported by facts known to Markovic's lawyers—that the reports revealed the omitted information and "removed the inflation" from the stock price.  (*See* UWM at 14.) Markovic cites no case overturning the Second Circuit's holding that a later-amended pleading is a party admission, *see Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705, 707 (2d Cir. 1989), nor does he even attempt to distinguish the dismissal in *Shepherd v. Powers*, 2012 U.S. Dist. LEXIS 141179, at *20 (S.D.N.Y. Sept. 27, 2012), of a claim because it was inconsistent with a prior complaint's factual allegations.  He cites only *In re PXRE Group, Ltd. Securities Litigation*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009), where the plaintiff had explicitly abandoned his initial pleading and stated that he would "defend the sufficiency of the [Proposed

Second Amended Complaint] rather than the initial CAC." *Id.* at 525.  Here, by contrast, neither

Lead Plaintiff nor Markovic has suggested retraction of the prior pleadings, asking only to

"reassert the Securities Act claims alleged in . . . [*Monroe County*] and add a class

representative" for them.  (*See* Ex. A to Decl. of David A. Rosenfeld.)  Indeed, both the CAC

and SCAC (i) allege that YPF's ADS price moved dramatically "in response to" the news about

the nationalization risk (*see* SCAC ¶¶ 89, 93; CAC ¶¶ 9, 106, 108), and (ii) point to the same

alleged "decline of approximately 75%" in YPF's ADS price over the entire 15 months before

nationalization (SCAC ¶ 160; CAC ¶ 105).  Markovic is therefore bound to both formulations.

*See Poindexter v. EMI Record Grp. Inc.*, 2012 U.S. Dist. LEXIS 42174, at *7 (S.D.N.Y. Mar. 27,

2012) ("[E]ven though the Amended Complaint is the operative pleading, the Court may still

credit admissions in the original complaint and attached exhibits.").

## II. The Securities Act Claims Would Be Untimely Even If the Limitations Period Were to Run from April 16, 2012.

The Underwriters have demonstrated why the Securities Act claims would be untimely

even if measured from the actual announcement of nationalization on April 16, 2012, and even

giving Markovic the full benefit of *American Pipe* tolling.  (*See* UWM at 19–21.)  Markovic's

half-hearted arguments to the contrary lack merit.

### A. Delaying the Commencement of the Limitations Period Until the April 16, 2012 Nationalization Would Still Require that Markovic Had Brought His Securities Act Claims by August 14, 2013.

Markovic's contention that he had until August 15, 2013, to bring his Securities Act

claims rests on his counterfactual allegation that Lead Plaintiff did not file the CAC until June 6,

2013.  But Markovic ignores the Underwriters' proof that (i) the Court set June 5, 2013, as the

CAC filing deadline and twice rejected Lead Plaintiff's request for more time; (ii) the Court's

docket reflects that the CAC was filed in the Court's drop box on the night of June 5; and

(iii) Lead Plaintiff and Robbins Geller *represented to the Court* that they had filed the CAC on June 5, 2013.  (*Id.* at 6.)  That the file-stamped copy of the CAC reflects that it was stamped at exactly midnight—so the date stamp had flipped to June 6 (*see* Opp. at 54)—shows only that Lead Plaintiff waited until the last possible minute to enter the courthouse and the file-stamping took an extra minute or two.  Likewise unfounded is Markovic's argument that investors monitoring the docket would have reasonably relied on a June 6 filing date.  (*Id.*)  Tellingly, Markovic fails to present any evidence—indeed, he fails even to argue—that he thought the CAC was not filed until June 6.  And that is no surprise.  An investor monitoring the docket would have seen the Court's order that the CAC be filed by June 5 and Lead Plaintiff's representation to the Court that he met that deadline.  And Markovic certainly should not be allowed to benefit from arguing that his counsel missed the Court's deadline (and then misrepresented compliance with that deadline in a court filing).  *See Softview Computer Prods. Corp. v. Haworth, Inc.*, 1999 WL 1225254, at *3 n.3 (S.D.N.Y. Dec. 20, 1999) (rejecting argument that "would be tantamount to permitting a party to benefit from its own violation of the Court's Order and would encourage such violations").

### B.   Markovic Did Not Bring His Securities Act Claims by August 14, 2013, and Is Not Entitled to Equitable Tolling for His Delay.

Markovic does not dispute that (i) the Second Circuit has held the date of filing a motion for leave to amend is the operative date for statute of limitations purposes (Opp. at 55, *citing Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)), and (ii) Lead Plaintiff did not file such a motion by August 14, 2013.  Instead, Markovic argues that Lead Plaintiff's July 22 letter to the Underwriters requesting their consent to an amendment was sufficient because it put the Underwriters on notice that Lead Plaintiff would try to assert Securities Act claims (even though he had admitted he had no standing to do so).  (*Id*. at 54–55.)  But as the Underwriters have

shown, *Rothman*'s conclusion that moving for leave to amend satisfies the statute of limitations is not based on "notice."  (*See* UWM at 19–20, n.10.)  Markovic has no answer and does not even attempt to distinguish the Underwriters' cases holding that notice, even if present, is not enough to trigger the limitations period.  In any event, the July 22 *request for consent* to amend is not "notice" that Lead Plaintiff *would* amend.  After the Underwriters refused to consent and explained why the new claims would fail, Lead Plaintiff appeared to abandon his attempted amendment, making no attempt to pursue it over the Underwriters' objections.  (*See id.* at 21.) That silence in the face of persuasive arguments on why amendment would be futile is not "notice" that the claims would be brought.  Putting aside whether the two cases Markovic cites— *Glatt v. Fox Searchlight Pictures Inc.*, 2013 U.S. Dist. LEXIS 82079 (S.D.N.Y. June 11, 2013) and *Reza v. Khatun*, 2013 WL 596600 (E.D.N.Y. Feb. 15, 2013)—were correctly decided, in each the plaintiff had notified the Court by letter that the plaintiff would seek leave to amend his complaint to add a party, which is functionally equivalent to moving for leave to amend.  Here, in contrast, Lead Plaintiff provided no such notification for his claim against the Underwriters.

Nor can Markovic obtain equitable tolling, because he has not established both that (i) he pursued his rights diligently and (ii) some "extraordinary circumstance" precluded him from filing earlier.  (*See* UWM at 20–21.)  As the Underwriters have shown (*id*. at 21), Markovic knew by August 1 that the Defendants would not consent to an amended complaint yet made no attempt to get his claims on file before August 14.  In arguing that "extraordinary circumstances" prevented him from getting his motion on file, Markovic points only to this Court's pre-motion procedures, without addressing the Underwriters' showing (*id*.) that those procedures allowed Lead Plaintiff to file his motion starting on August 1 (by which time even Repsol had been served) and yet Lead Plaintiff did nothing to bring his motion thereafter.  If the Court's generally

applicable case-management procedures constituted "extraordinary circumstances" sufficient to justify equitable tolling, the statute of limitations would become meaningless.

III. **The Securities Act Claims Are Untimely Even If the Limitations Period Did Not Begin to Run Until the June 1 Publication of the Mosconi Report Because Markovic Is Not Entitled to *American Pipe* Tolling.**

Other than citing the Court's October 8, 2013 Order, Markovic fails to respond to the Underwriters' arguments that he is not entitled to any *American Pipe* tolling because (i) Monroe County did not have standing to bring Securities Act claims, and (ii) Monroe County's complaint must be treated as a legal nullity. (*Id.* at 22–24.) But the Court stated after issuing that order that it would fully consider the Underwriters' arguments on a complete motion-to-dismiss record. (Oct. 15 Tr. at 5:9–7:11.) Markovic has failed to show that he reasonably relied on Monroe County to represent his interests because its lack of standing was clear from the face of its placeholder complaint. (*See* UWM at 22–24.) Even though the Underwriters invited him to do so (*id.* at 24), Markovic provides no sworn testimony (and does not even allege or argue) that he relied on *Monroe County*. He even concedes knowing that Monroe County did not purchase shares in the March 2011 offering (Opp. at 57 ("Monroe County was an aftermarket purchaser")), meaning that he knew or should have known that it did not have standing to bring a Section 12 claim.

Markovic argues that Monroe County could have had Section 11 standing because it alleged that it purchased YPF shares "pursuant and/or traceable to the Registration Statement." (*Id.*) But the cases Markovic cites involved aftermarket purchases that could have been traceable only to a single offering. *See DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003) (holding that any purchaser has standing to sue under Section 11 in cases "where there has been only one stock offering"); *Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at *11 (S.D.N.Y. Aug. 22, 2013) ("[Defendant] issued only one registration statement here, under which . . . all previously

outstanding shares were registered.").  That is simply not the case here, where the offering documents relied on in the SCAC state that 8.63% of the ADS were already trading publicly by the date of the offering.  (*See* YPF S.A., Prospectus (Form 424B2) S-10 (Mar. 23, 2011) (Repsol Ex. B).)  Likewise unavailing is Markovic's argument that this case is different from *In re Initial Public Offering Securities Litigation*, 227 F.R.D. 65 (S.D.N.Y. 2004), *vacated on other grounds and remanded*, 471 F.3d 24 (2d Cir. 2006), because unregistered YPF shares were in the market before the offering, rather than after it.  (*See* Opp. at 58, n.23.)  The timing makes no difference; the point is that traceability is impossible when both registered and unregistered shares are in the market at the same time.

Moreover, Markovic cannot claim to have reasonably relied on *Monroe County* after April 8, when (i) Robbins Geller abandoned it in favor of Felix Portnoy, and (ii) Portnoy filed a complaint that *did not assert Securities Act claims*.  Thus, Markovic's argument that he was not required to "examine" Portnoy's motion papers or trading records (*see id.* at 58–59) is beside the point.  All Markovic had to do was scan the first few paragraphs (or even just the headings) of Portnoy's complaint to see that he was not bringing Securities Act claims.  Nor was it reasonable to *assume* that Portnoy would submit a further amended complaint simply because he "*could have included* a named plaintiff with standing to pursue those claims" (*id.* at 59).  *See Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 117–18 (2d Cir. 2013) (affirming denial of *American Pipe* tolling because reliance on a "remote possibility" is "not objectively reasonable").

## CONCLUSION

For all these reasons, and the reasons explained in YPF's and Repsol's opening and reply briefs, the Court should dismiss the claims against the Underwriters with prejudice.

Dated:  New York, New York           O'MELVENY & MYERS LLP
        January 10, 2014


                                     By:  _s/ Jonathan Rosenberg_____
                                          Jonathan Rosenberg
                                          jrosenberg@omm.com
                                          Abby F. Rudzin
                                          arudzin@omm.com
                                          Edward Moss
                                          emoss@omm.com

                                          Times Square Tower
                                          7 Times Square
                                          New York, New York  10036-6524
                                          Ph: (212) 326-2000
                                          Fx: (212) 326-2061

                                          *Attorneys for Defendants Morgan Stanley &
                                          Co. Incorporated, Credit Suisse Securities
                                          (USA) LLC, and Goldman, Sachs & Co.*