UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM,

                             Plaintiff,

-against-

YPF SOCIEDAD ANÓNIMA, et al.,

                             Defendants.

---

Civil Action No. 1:13-cv-00842 (SAS)
(Consolidated)

# DEFENDANT YPF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT

CHADBOURNE & PARKE LLP
*Attorneys for Defendant YPF*
   *Sociedad Anónima*
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100

Thomas J. Hall
Marcelo Blackburn
Brittney Renzulli (Admission Pending)
    Of Counsel

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...................................................................................................................................2

I. THE INFORMATION THAT THE COMPLAINT ALLEGES
YPF FAILED TO DISCLOSE WAS PUBLIC KNOWLEDGE ........................................2

    A. Paragraph 125(i): "Repsol Was Deliberately Not Investing
In Argentinean Exploration Projects And, Instead, Was
Using YPF's Profits To Pay Unusually High Dividends
And To Fund Repsol's Own International Expansion
Efforts." ..................................................................................................................2

    B. Paragraph 125(ii): "YPF's Failure To Finance Domestic
Exploration And Development Caused The Company To
Breach Its Concession Contracts With Various Argentinean
Provinces." ..............................................................................................................4

    C. Paragraph 125(iii): "YPF's Failure To Invest Domestically
Increased The Risk That The Company Would Be
Nationalized." .........................................................................................................5

    D. Paragraph 125(iv): "Nationalization By The Argentinean
Government Would Likely Have A Severe Adverse Effect
On Shareholders And On The Company's Market Value." ....................................6

II. THE MOSCONI REPORT DID NOT REVEAL ADDITIONAL
FACTS THAT WOULD SUPPORT A SECURITIES CLAIM ..........................................6

    A. The Mosconi Report Did Not Reveal Any Misstatements
by YPF ....................................................................................................................7

    B. The Mosconi Report Did Not Reveal the Cause of
Plaintiffs' Alleged Damages .................................................................................10

III. THE COMPLAINT FAILS TO ALLEGE FACTS CREATING A STRONG
INFERENCE THAT YPF ACTED WITH FRAUDULENT INTENT .............................12

CONCLUSION ..............................................................................................................................13

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Kuriakose v. Fed. Home Loan Mortg. Corp.,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ............................................................................... 10

In re Parmalat Secs. Litig.,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005) ............................................................................... 11

San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co., Inc.,
   75 F.3d 801 (2d Cir. 1996) ................................................................................................. 9

Solow v. Citigroup, Inc.,
   10 Civ. 2927, 2012 WL 1813277 (S.D.N.Y. May 18, 2012) ............................................. 4

Stayton v. Am. Express Co.,
   604 F.3d 758 (2d Cir. 2010) ............................................................................................... 5

In re Time Warner Inc., Sec. Litig.,
   9 F.3d 259 (2d Cir. 1993) ................................................................................................. 10

**Federal Rules**

Fed. R. Civ. P. 8 ........................................................................................................................ 15

**PRELIMINARY STATEMENT**[1]

In its initial brief, YPF showed that the Second Consolidated Amended Complaint (the "complaint" or "SCAC") should be dismissed because, among other reasons, the risk of the Argentine government expropriating YPF had been public knowledge long before it was allegedly disclosed on April 16, 2012, when the Argentine government announced the expropriation.

In the face of this showing, plaintiffs abandon their original premise that the risk of expropriation was first known on April 16, 2012, and attempt to advance a new theory. Plaintiffs now argue, for the first time, that defendants' fraud actually was concealing Repsol's "true motives" for the low investment levels and high dividends. Plaintiffs allege that Repsol's "true motives" were to use low investment levels to force the Argentine government to abandon its price controls on natural gas. Opp. Br. at 16. Plaintiffs further argue that, because Repsol's motives were not revealed until the Mosconi Report was published on June 1, 2012, their Securities Act claims are timely.

Plaintiffs' new theory utterly fails to salvage their complaint. First, the information that *the complaint alleges* was not disclosed -- the low levels of domestic investment and high dividends -- plaintiffs now concede was in fact disclosed. Second, the complaint does not allege that Repsol's motives increased the risk of expropriation, or caused their losses. Rather, it alleges that the expropriation was caused by the actual low investment levels and high dividend payments, all of which plaintiffs now acknowledge were publicly disclosed, not by the motives behind it.

---

[1]  Unless otherwise indicated, emphasis has been added throughout this brief. By assuming in this brief the truth of certain allegations in the complaint, YPF does not concede their accuracy.

Finally, for the reasons set forth in the Underwriters' Reply Memorandum of Law, which YPF incorporates by reference, plaintiffs' attempt to rely on the Mosconi Report's publication date of June 1, 2012 to avoid the statute of limitations on its Securities Act claims is unavailing.

## ARGUMENT

### I.

### THE INFORMATION THAT THE COMPLAINT ALLEGES YPF FAILED TO DISCLOSE WAS PUBLIC KNOWLEDGE

Plaintiffs' complaint specifies the information that the defendants allegedly failed to disclose:

> (i) that Repsol was deliberately not investing in Argentinean exploration projects and, instead, was using the YPF's profits to pay unusually high dividends and to fund Repsol's own international expansion efforts; (ii) that YPF's failure to finance domestic exploration and development caused the Company to breach its concession contracts with various Argentinean provinces; (iii) that YPF's failure to invest domestically increased the risk that the Company would be nationalized; and (iv) that nationalization by the Argentinean government would likely have a severe adverse effect on shareholders and on the Company's market value.

SCAC ¶¶ 125, 134, 145; see also SCAC ¶¶ 79, 73.  In our opening brief, YPF showed that each of these four so-called omissions had in fact been disclosed or was otherwise public knowledge. See YPF Br. at 11-18.  Crucially, as discussed below, plaintiffs now do not deny the public nature of this information.

A.  **Paragraph 125(i): "Repsol Was Deliberately Not Investing In Argentinean Exploration Projects And, Instead, Was Using YPF's Profits To Pay Unusually High Dividends And To Fund Repsol's Own International Expansion Efforts"**

Plaintiffs now acknowledge that YPF accurately disclosed in its SEC filings both its level of investments in exploration and production in Argentina and the amounts of its dividend payments, and that YPF's investment levels and dividend payments were the subject of numerous analyst reports and press articles.  See YPF Br. at 11-13.  To quote plaintiffs' opposing brief:

"Plaintiffs do not challenge the accuracy of YPF's 'hard' numbers regarding investments, costs or any other financial metric relating to its domestic oil and gas projects." Opp. Br. at 15.  Plaintiffs continue:  "Plaintiffs acknowledge that the Company Defendants disclosed certain information about dividend payments and divestiture plans."  Opp. Br. at 15.

Rather, plaintiffs now assert "that the Company Defendants concealed that those investment figures were grossly inadequate based on Repsol's strategy to abandon YPF's exploratory activities . . ." (Opp. Br. at 15), which was "the reason[] why Repsol was taking so much capital out of the Company."  Opp. Br. at 16.  Plaintiffs continue:  "By concealing their true motives, the Company Defendants gave a 'false impression' of YPF's business operations, notwithstanding the purported accuracy of its financial reporting."  Id.

Plaintiffs' assertion that Repsol concealed its "strategy" or "motives" to underfund exploration and overpay dividends is a red herring.  The complaint alleges that it was the actual low levels of investment in Argentina combined with high dividends -- not the strategy or motives behind it -- that increased the risk of expropriation and actually led to the expropriation.  For example, in their brief, plaintiffs recognize that as early as 2007, "the Argentine government took notice of YPF's declining production" (Opp. Br. at 5), and that YPF's disclosures "raised concerns in the Argentine government that YPF's production levels were insufficient to satisfy Argentina's burgeoning energy needs."  Opp. Br. at 2.  Indeed, plaintiffs note that the inadequate level of YPF's investments was a consistent theme in the Argentine government's criticism of YPF.  See Opp. Br. at 7 ("the Argentine Planning Minster criticized YPF's lack of production and investment in domestic oil, stating that YPF had 'not conducted the investment necessary to expand its refineries in the timeframe needed by the sustained growth in demand in the country. ¶ 90.").

Because there is no dispute that YPF accurately disclosed the amounts it was investing in exploration and production and the amounts it was paying in dividends, and because it was widely known that the Argentine government took issue with these amounts, plaintiffs' argument appears to boil down to an accusation that YPF itself did not describe its investment levels as inadequate. The securities laws, however, do not require issuers to "characterize [their] behavior in a pejorative manner." Solow v. Citigroup, Inc., 10 Civ. 2927, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012) (Sweet, J) (quoting Harrison v. Rubenstein, 02 Civ. 9356, 2007 WL 582955, at *13 (S.D.N.Y. Feb. 26, 2007)). What YPF was required do is accurately disclose its material expenditures, which plaintiffs concede YPF did. See Opp. Br. at 15.

**B.  Paragraph 125(ii): "YPF's Failure To Finance Domestic Exploration And Development Caused The Company To Breach Its Concession Contracts With Various Argentinean Provinces"**

Plaintiffs also do not dispute that YPF and Repsol disclosed the risk of revocation of YPF's concession contracts with the provinces. See YPF Br. at 14. Although they argue in a footnote that Repsol's disclosures about declining production present a factual question as to whether they were sufficient to warn investors of the risk of revocation (Opp. Br. at 16 n.7), this argument does not change the fact that YPF disclosed that the concessions could be revoked, and that such a revocation could have a material effect on YPF. YPF Br. at 14.

Plaintiffs' vague allegation that YPF did not disclose that it was actually in breach of its concession contracts (Opp. Br. at 15-16) does not support a claim because, as set forth in YPF's Brief (YPF Br. at 14), the complaint fails to specify a single fact about any such alleged breach, including such basic information as which concession contract was breached, the nature of such breach, whether it was material or immaterial, when any such breach occurred, or whether it was

4

cured.[2]  Such a vague allegation fails to satisfy the pleading requirement of Federal Rule of Civil Procedure 8, much less the PSLRA's requirement that allegations of securities fraud be stated with particularity.  See Stayton v. Am. Express Co., 604 F.3d 758, 776 (2d Cir. 2010).

### C. Paragraph 125(iii): "YPF's Failure To Invest Domestically Increased The Risk That The Company Would Be Nationalized"

Plaintiffs concede that the rising risk of expropriation was public knowledge.  As plaintiffs state in their opposing brief: "[T]hese reports show that beginning in early 2012, there was an elevated risk that YPF might be nationalized, and that the possibility of nationalization was the subject of rumors, political debate and market speculation." Opp. Br. at 44.  In addition, the opposing brief concedes that investors knew that the reason for the rising risk of expropriation was the Argentine government's concern with YPF's levels of investment and production:

> "By January 30, 2012, local news agencies, *citing a lack of investment and production*, reported that the Argentine government was considering a takeover of YPF. ¶89.  Days later, *the Argentine Planning Minster criticized YPF's lack of production and investment in domestic oil, stating that YPF had 'not conducted the investment necessary to expand its refineries in the timeframe needed by the sustained growth in demand in the country*.  ¶90."

Opp. Br. at 7.[3]

---

[2]  Plaintiffs claim in a footnote that "Repsol concedes that those contracts were breached" (Opp. Br. at 16 n.7), but this statement mischaracterizes Repsol's argument, which makes no such concession.

[3]  Plaintiffs do not dispute "that the SAC 'lacks a single allegation' that 'YPF was aware of the government's expropriation plans before the government publicly disclosed them in 2012'" and acknowledge that they do not allege that YPF "was actually privy to the government's plans." Opp. Br. at 32 n.10.

**D.      Paragraph 125(iv): "Nationalization By The Argentinean Government Would Likely Have A Severe Adverse Effect On Shareholders And On The Company's Market Value"**

Finally, we refer to the undisputed explanation set forth in YPF's initial motion to dismiss for why Plaintiffs' allegation concerning the effect of an expropriation fails to set forth a claim. See YPF Br. at 17-18.

In sum, as the plaintiffs' opposition makes clear, there is no dispute that the four categories of allegedly omitted information set forth in paragraph 125 of the SCAC were in fact not concealed from the investing public, but rather were publicly known, mandating dismissal of the complaint.

**II.**

**THE MOSCONI REPORT DID NOT REVEAL NEW FACTS THAT WOULD SUPPORT A SECURITIES CLAIM**

Although plaintiffs do not dispute that YPF accurately disclosed its investment levels and dividend payments, and that the risk of expropriation resulting from those low investment levels and high dividend payments was widely known well before the April 16, 2012 expropriation announcement, they argue that these disclosures were insufficient because they "left investors in the dark concerning Repsol's true plans for the Company, and the reasons why Repsol was taking so much capital out of the Company." Opp. Br. at 16.  According to plaintiffs' brief, Repsol's "true motives" were to reduce investment in YPF so as "to pressure the Argentine government to increase domestic energy prices by reducing supply and increasing demand." Id.  Incredibly, plaintiffs go on to assert that because "[a] reasonably diligent plaintiff could not have stated a plausible claim until this conduct was revealed by the Mosconi Report on June 1, 2012" (Opp. Br. at 3), their claims are not time-barred.

6

Plaintiffs' argument that the June 1, 2012 Mosconi Report revealed the alleged misrepresentations is directly contradicted by the SCAC and its prior pleadings. Neither the original complaint filed in this case on February 5, 2013, nor the complaint that Lead Plaintiff filed on April 8, 2013, even mention the Mosconi Report. See Complaint, Portnoy v. YPF Sociedad Anonima, 13-cv-2316 (Dkt. # 1); Complaint, Monroe County Employees' Retirement System v. YPF Sociedad Anonima, 13-cv-0842 (Dkt. # 1). And while the SCAC quotes from the Mosconi Report to add color to its allegations (¶¶ 11, 61, 63-70, 154-156), it does not allege that its June 1, 2012 publication revealed the fraud. To the contrary, the SCAC repeatedly alleges that the defendants' omissions become known by April 16, 2012, before the investigation that led to the Mosconi Report had even begun. SCAC ¶ 99, 160, 162. Indeed, the class period alleged in the SCAC ends on April 16, 2012 (¶ 43), the date the expropriation was announced, not the June 1, 2012 date the Mosconi Report was published.

Moreover, as discussed below, the opposition brief's reliance on the Mosconi Report is entirely misplaced because the Mosconi Report's findings neither showed that YPF had made any misstatements nor revealed the cause of plaintiffs' alleged damages.

**A.      The Mosconi Report Did Not Reveal New
         Information as to the Reasons for the Exporpriation**

As a threshold matter, plaintiffs' new theory cannot salvage the complaint because nowhere does the complaint allege that YPF's statements were misleading because of the failure to disclose Repsol's alleged motives to force the government to abandon its price controls, as described in the Mosconi Report, or that the disclosure of that scheme in June 2012 is what caused plaintiffs' losses. Rather the complaint alleges that the omission that increased the risk of expropriation "was using YPF's profits to pay unusually high dividends and to fund Repsol's own international expansion efforts." SCAC ¶ 125. The complaint further alleges:

7

- "The Argentinean government's concerns included:  (i) that ***YPF was not adequately producing oil and gas domestically*** via concession contracts; and (ii) that YPF was distributing a large portion of its profits to Repsol and its other shareholders in the form of high dividends rather than reinvesting them back into the Company and its operations."  SCAC ¶ 3 (footnote omitted).

- "In December 2007, the Argentinean government, through its newly elected President, Christina Fernández ("Fernández"), again ***warned YPF to lower its dividend payouts and increase its investment in Argentinean concession contracts***."  SCAC ¶ 5.

- "At the time of the Offering, as detailed herein, YPF was not adequately producing oil and gas within Argentina; and was distributing a large portion of its profits to Repsol and its other shareholders in the form of high dividends instead of reinvesting them back into the Company and its operations.  Moreover, despite warnings from the government, ***YPF failed to make the proper adjustments and continued to under-produce and was not adequately funding Argentinean energy projects***.  Thus, the risk of nationalization was reasonably likely to have a material impact on YPF's continuing operations and, therefore, was required to be disclosed in the Registration Statement, but was not."  SCAC ¶ 73.

- "On January 30, 2012, it was reported to sources outside the Company that Argentine officials were discussing a government takeover of YPF ***because of the Company's lack of investment***."  SCAC ¶ 89.

- "Similarly, at the start of February 2012, the Argentinean Planning Minister ***criticized YPF's lack of production and investment in domestic oil*** stating that the Company had 'not conducted the investment necessary to expand its refineries in the timeframe needed by the sustained growth in demand in the country.'"  SCAC ¶ 90.

Indeed, even the opposition brief concedes at times that it was not the failure to disclose Repsol's "true motives," but the actual low levels of investment and of high dividend payments that is the basis for the claims.  The opposing brief asserts that "the SAC actually alleges, based on the Mosconi Report, that Repsol and YPF failed to disclose the 'long-running ***conduct***' that caused the government to nationalize YPF" (Opp. Br. at 3), and that the "Mosconi Report's detailed findings and conclusions clearly and unmistakably demonstrate that Repsol knowingly

8

engaged in *conduct* that contradicted its public statements." Id. at 29.  As defendants demonstrated in their moving papers, it was precisely Repsol's and YPF's conduct -- investments in exploration and production and payment of dividends -- that was public knowledge well before the publication of the Mosconi Report.

To the extent plaintiffs suggest that the Mosconi Report's findings contradict Repsol's statements concerning its commitment to investing in Argentina, those statements cannot support a claim against YPF.  For one, as plaintiffs concede, YPF cannot be held responsible for any statement made by Repsol.  See Opp. Br. at 14 n.6 ("Plaintiffs do not contend that YPF is liable of Repsol's statements").  Moreover, as plaintiffs concede, YPF accurately disclosed its actual investment and dividend levels.

In fact, the only statement allegedly made by YPF to which plaintiffs attempt to point to as inconsistent with the findings of the Mosconi Report is the alleged statement by Eskenazi, YPF's CEO, in connection with the December 2009 announcement of the Horizon 2014 that YPF would "invest the resources that are necessary to explore all of the country."  Opp. Br. at 23 (citing SCAC ¶ 23).  This statement simply cannot support the weight plaintiffs have placed upon it.  First, the declaration that YPF planned to "explore all the country" would have been understood by investors to be immaterial puffery, and not an absurd commitment to explore every square inch of Argentina.  "Such puffery cannot have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy, and cannot constitute actionable statements under the securities laws."  San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 811 (2d Cir. 1996) (citations omitted).

9

Second, the phrase "explore all the country" is vague, and plaintiffs have alleged no facts that would show that YPF's exploration activities did not, in fact, encompass "all the country." To the contrary, YPF's SEC filings demonstrate that it was engaged in extensive exploration throughout Argentina.  See, e.g., Hall Dec. Exh's. A at 33-34; B at 23-25, 32, 102;  J at 8-9, Nov. 26, 2013, ECF No. 47.

Finally, Eskenazi's alleged statement was made more than two years before the plaintiffs allege to have suffered losses, and in the intervening period YPF regularly published specific and updated information on its domestic exploration activities.  As the Second Circuit has explained, "original opinions or projections" can be subsequently updated by specific disclosures so as to prevent them from being considered "misleading."  In re Time Warner Inc., Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993); see also Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 182 (S.D.N.Y. 2012) (Keenan, J.) (finding that Freddie Mac's "extensive disclosures" rendered the alleged misrepresentations immaterial because a reasonable investor, "with little effort," could "take his own measure of risk in Freddie Mac's loan portfolio.").

**B.     The Mosconi Report Did Not Reveal
        the Cause of Plaintiffs' Alleged Damages**

Second, the complaint contradicts plaintiffs' new assertion that the alleged omission of Repsol's motives "to pressure the Argentine government to increase domestic energy prices by reducing supply and increasing demand" caused plaintiffs' alleged losses.  Plaintiffs' complaint alleges that they suffered loss when the Argentine government expropriated Repsol's interest in YPF in April 2012 because of a lack of investment and production.  Opp. Br. at 9 (citing SCAC ¶¶ 63, 146).  There is not a single allegation in the SCAC to support the conclusion that Repsol's "true motives" in underinvesting had any bearing on the government decision to expropriate, as contrasted with the publicly disclosed actual levels of investment and dividends.

10

Not only were Repsol's "true motives" never cited by the government as a basis for the expropriation, the SCAC fails to allege that the Argentine government was even aware of Repsol's alleged scheme to force it to abandon price controls when it announced the expropriation. To the contrary, plaintiffs acknowledge it was only "in the aftermath of the takeover [that] the Argentine government conducted an investigation into Repsol's control over YPF's operations." Opp. Br. at 9. Nothing in the Mosconi Report or the SCAC alters the fact that the Argentine government based the rationale for its April 16 expropriation on Repsol's previously disclosed *conduct*, and not on Repsol's "motives" for that conduct discovered months after the expropriation had occurred. Indeed, the complaint alleges that the government gave the following reason for the expropriation:

> "President Fernández cited to YPF's lack of production and investment in Argentina as well as Argentina's history of spending billions of dollars on importing gas and petroleum despite its plentiful domestic resources." SCAC ¶ 63.

For these reasons, plaintiffs' reliance on In re Parmalat Secs. Litig., 375 F. Supp. 2d 278 (S.D.N.Y. 2005), is misplaced. Opp. Br. at 36-37. In that case, the court found that Parmalat had concealed massive debt. When Parmalat was unable to pay its debt as it came due, its share price collapsed. The court reasoned that although the full extent of the fraud was not disclosed until after the price decline, it was actionable because the concealed existence of the debt had arguably caused the decline. Id. Here, in contrast, no facts are alleged to show that Repsol's "true motives" or "scheme" caused Argentina's to expropriate its interest in YPF independently of Repsol's publicly disclosed levels of investment in YPF and its receipt of high dividend payments. Rather, the SCAC plainly alleges that those factors caused the expropriation regardless of and well before Repsol's motives were revealed.

11

## III.

## THE COMPLAINT FAILS TO ALLEGE FACTS CREATING A STRONG INFERENCE THAT YPF ACTED WITH FRAUDULENT INTENT

As explained by YPF's initial moving brief, the complaint falls far short of creating a "strong inference" that YPF acted with fraudulent intent when it made the handful of statements attributed to it in the complaint, as required by the PSLRA.  See YPF Br. at 8-9, 20-26.  The complaint alleges no facts that would either (1) show that YPF had the "motive and opportunity" to commit fraud, or (2) present strong circumstantial evidence of conscious behavior or recklessness by YPF.  To the contrary, the complaint's allegations paint YPF as the victim of Repsol's alleged fraud.  Id. at 20-26.

Significantly, while plaintiffs argue that the complaint adequately pleads that Repsol had the motive and opportunity to commit fraud, it makes no such argument with respect to YPF. See Opp. Br. at 26-28.  Plaintiffs argue only that YPF must have known of Repsol's motives because YPF's "management team was hand-picked by Repsol solely because of their relationship with the Argentine government," and that even if YPF had been unaware of Repsol's motives, it knew that Repsol's failure to invest in YPF's projects caused a significant decline in oil and gas production, which exacerbated the risk that Argentina would nationalize YPF.  Opp. Br. at 31.

Neither of plaintiffs' arguments establishes scienter.  On its face, the assertion that, because YPF's management team was allegedly hand-picked for its relationship with the Argentine government, they therefore knew Repsol's motives is an unfounded non-sequitur, and plaintiffs make no attempt to explain the connection.  Similarly, the fact that YPF and Repsol had certain overlapping board members does not by itself establish that YPF "knew" of Repsol's alleged scheme.  Moreover, plaintiffs' argument that YPF knew that Repsol's investment levels

12

exacerbated the risk of expropriation misses the point, as plaintiffs acknowledge that information was publicly known.

## CONCLUSION

Plaintiffs' newly invented argument that the Mosconi Report revealed defendants' omissions for the first time on June 1, 2012 fails (1) to rebut defendants' showing that the alleged omissions as alleged in the complaint were fully disclosed or otherwise public knowledge well before the expropriation, (2) to show that YPF made any actionable misstatement, or (3) to present facts supporting a strong inference that YPF acted with fraudulent intent.  As such, the Second Consolidated Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

CHADBOURNE & PARKE LLP

By       /s/ Thomas. J. Hall
Thomas J. Hall
A Member of the Firm
*Attorneys for Defendant YPF Sociedad Anónima*
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100
thall@chadbourne.com

Thomas J. Hall
Marcelo Blackburn
Brittney Renzulli (Admission Pending)

Of Counsel

January 10, 2014