UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

MONROE COUNTY EMPLOYEES'
RETIREMENT SYSTEM,

                  Plaintiff,

               - against -

YPF SOCIEDAD ANONIMA, et al.,

                Defendants.

------------------------------------------------------------ X

**OPINION AND ORDER**

**13 Civ. 842 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/20/14

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.     INTRODUCTION

          On February 5, 2013, Monroe County Employees' Retirement System filed a putative class action Complaint (the "February 5 Complaint") against defendants alleging violations of the Securities Act of 1933 ("Securities Act"). On June 5, 2013, plaintiffs filed a Consolidated Amended Complaint ("CAC") asserting claims under the Securities and Exchange Act of 1934 ("Exchange Act") but omitting the original Securities Act claims. In an opinion dated October 8, 2013 (the "October 8 Order"), I granted leave for plaintiffs to file a Second Consolidated Amended Complaint ("SAC") reasserting the Securities Act Claims on behalf of a new plaintiff, David Markovic.[1] I concluded that Markovic's claims

1

against certain defendants were tolled pursuant to the doctrine set out in *American Pipe & Construction Co. v. Utah*.[2]  For purposes of the tolling analysis, I credited plaintiffs' assertion that the statute of limitations did not begin to run until April 16, 2012, and that the CAC was filed on June 6, 2013.[3]  I indicated that defendants could fully brief the issue of timeliness in their motions to dismiss.[4]

The SAC asserts claims under Sections 11 and 12 of the Securities Act against YPF Sociedad Anonima ("YPF"); Repsol YPF, S.A. ("Repsol"); Morgan Stanley & Co., Credit Suisse Securities (USA) LLC, and Goldman, Sachs & Co. (the "Underwriters"); and Sebastian Eskenazi,[5] Guillermo Reda,[6] Antonio Brufau Niubo,[7] Antonio Gomis Sáez, Raúl Fortunato Cardoso Maycotte, Fernando Ramirez Mazarredo, Fernando Mañero, Luis Suárez de Leze Mantilla, and Javier

---

[1]     *See Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima,* No. 13 Civ. 842, 2013 WL 5548833 (S.D.N.Y. Oct. 8, 2013).

[2]     *See* 414 U.S. 538 (1974).

[3]     *See Monroe,* 2013 WL 5548833, at *2.

[4]     *See id.*

[5]     Eskenazi was at all relevant times YPF's Executive Vice-Chairman, Chief Executive Officer ("CEO"), and Director.  *See* SAC ¶ 22.

[6]     Reda was at all relevant times YPF's Chief Financial Officer.  *See id.* ¶ 23.

[7]     Brufau was at all relevant times Repsol's Chairman and CEO.  *See id.* ¶ 21.

Monzón (the "Individual Defendants").[8]  The Securities Act claims are based on a March 23, 2011 offering of YPF American Depository Shares ("ADSs") (the "Offering").

Although the SAC reasserts Securities Act claims against the Individual Defendants, the October 8 Order explicitly declined to toll the statute of limitations against those defendants.[9]  Therefore, plaintiffs' Securities Act claims against the Individual Defendants are hereby dismissed as untimely and will not be discussed below.

The SAC also asserts claims under Section 10(b) of the Exchange Act against Repsol, YPF, and the Individual Defendants, and Section 20(a) against Repsol and the Individual Defendants.[10]  The class period for the Exchange Act claims runs from December 22, 2009 to April 16, 2012 (the "Class Period").[11]

---

[8]  Sáez, Maycotte, Mazarredo, Mañero, Mantilla, and Monzón were all directors of YPF during the relevant time period.  *See id.* ¶¶ 25–30.  Plaintiffs voluntarily dismissed their Securities Act claims against the above individuals on November 7, 2013.  *See* Notice of Voluntary Dismissal Pursuant to Fed. R. Civ. P. 41(a)(1), Dkt. No. 38.

[9]  *See Monroe,* 2013 WL 5548833, at *3.

[10]  Although the SAC asserts Section 10(b) claims against "All Defendants," plaintiffs submitted a letter to the Court clarifying that they did not intend to assert Section 10(b) claims against the Underwriters.  *See* Letter from Mario Alba, plaintiffs' counsel, to the Court (Nov. 18, 2013).

[11]  *See* SAC ¶ 1.

Repsol, YPF, and the Underwriters now move to dismiss the SAC. They argue that the Securities Act claims are untimely, and the Exchange Act claims fail to adequately allege material misrepresentations or omissions, scienter, loss causation and reliance.  For the reasons that follow, all three motions to dismiss are granted in full.  The claims against the Individual Defendants are dismissed *sua sponte.*

## II.   BACKGROUND INFORMATION[12]

### A.   Timeline of Events

YPF describes itself as "Argentina's leading energy company, operating a fully integrated oil and gas chain with leading market positions" in exploration, production, and refining petroleum.[13]  Throughout the Class Period, YPF ADSs were traded on the New York Stock Exchange.[14]  In 1999, Repsol, a Spanish corporation, acquired ninety-nine percent of YPF.[15]  Although Repsol decreased its stake significantly after 2007, it remained YPF's majority shareholder throughout the relevant time period.[16]

---

[12]   Unless otherwise indicated, the facts below are drawn from the SAC.

[13]   *Id.* ¶ 49 (quoting unidentified source).

[14]   *See id.* ¶ 44.

[15]   *See id.* ¶ 50.

[16]   *See id.* ¶¶ 9, 50–52.

On November 26, 2010, YPF filed a Form F-3 Registration Statement for a proposed stock offering (the "Registration Statement").[17]  On March 23, 2011, YPF completed the stock offering of over 26.2 million ADSs at $41 per share.[18]  The Prospectus Supplement to the Registration Statement, which became effective the date of the Offering, incorporated by reference the "risk factors" section of YPF's Form 6-K from February 24, 2011.[19]

On January 30, 2012, media reports indicated that "Argentine officials were discussing a government takeover of YPF because of the Company's lack of investment."[20]  In response, the value of YPF's ADSs declined by more than ten percent.[21]

In early February 2012, the Argentinian Planning Minister criticized YPF's lack of production and investment in domestic oil, stating that YPF had "not conducted the investment necessary to expand its refineries in the timeframe needed by the sustained growth in demand in the country."[22]

---

[17]     *See id.* ¶ 71.

[18]     *See id.* ¶ 72.

[19]     *See id.*

[20]     *Id.* ¶ 89.

[21]     *See id.*

[22]     *Id.* ¶ 90 (quoting unidentified source).

On February 8, 2012, Repsol announced additional successes in the Vaca Muerta area, stating that if "exploration proves successful in the Vaca Muerta formation and immediate intensive development began in the area, in 10 years its capacity could double Argentina's existing gas and oil production."[23]  In response to this news, the price of YPF ADSs rose by over ten percent.[24]

On February 29, 2012, Brufau met with Argentinian President Cristina Fernández de Kirchner to discuss the government's dissatisfaction with YPF's domestic investment levels.  In response, YPF's stock fell by over fourteen percent.[25]

The same day, Repsol issued a press release stating that "Argentina has the opportunity to reproduce the revolution in non-conventional hydrocarbons seen in the United States by developing the resources contained in the Vaca Muerta foundation."[26]  The following day, March 1, 2012, YPF's stock rose by over twelve percent.[27]

---

[23]    *Id.* ¶ 91 (quoting unidentified source).

[24]    *See id.* ¶ 92.

[25]    *See id.* ¶ 93.

[26]    *Id.* ¶ 94 (quoting unidentified press release).

[27]    *See id.* ¶ 95.  Defendants argue that YPF's stock rose on March 1, 2012 because President Kirchner gave a major public address that did not mention any plan to nationalize YPF.  Because Repsol's press release was issued before the

On March 29, 2012, YPF announced that it had discovered the presence of significant additional oil resources in the Vaca Muerta foundation. That day, YPF's stock rose by over five percent.[28]

On April 16, 2012, the government of Argentina officially announced that it would nationalize YPF, citing a lack of domestic production and investment.[29]  Trading in YPF ADSs was halted on April 17, 2012.  When trading resumed on April 18, 2012, the price of YPF ADSs had dropped by over thirty-two percent.[30]

The government of Argentina subsequently initiated an audit and investigation of Repsol and published its findings in the "Mosconi Report" on June 1, 2012.[31]  The Mosconi Report's self-proclaimed purpose was to "provide evidence [of Repsol's] strategy of depredation, disinvestment and failure to

---

market even opened on February 29, 2012, defendants argue, any optimistic response to the press release would have been reflected in YPF's share price on February 29 rather than March 1.  *See* Memorandum of Law in Support of the Underwriter Defendants' Motion to Dismiss the Second Consolidated Amended Complaint ("Underwriter Mem."), at 18 n.9.  However, the cause of the price increase need not be determined at this time.

[28]     *See* SAC ¶¶ 96–97.

[29]     *See id.* ¶ 63.

[30]     *See id.* ¶ 98.

[31]     *See id.* ¶ 11.

appropriately supply the domestic market" since assuming control of YPF in 1999.[32]

### B.    The Registration Statement

Plaintiffs contend that "the risk of nationalization was reasonably likely to have a material impact on YPF's continuing operations and, therefore, was required to be disclosed in the Registration Statement, but was not."[33] Instead, the Registration Statement discussed in general terms the potential impact of government policy on YPF's operations.[34]  The Registration Statement also disclosed the risk that exploration and production concessions could be terminated for "substantial and unjustifiable failure to comply with specified production, conservation, investment, work or other obligations."[35]  Similarly, YPF's Form 6-K of February 24, 2011, which was incorporated by reference into the Registration

---

[32]     *Id.* (quoting the Mosconi Report, Ex. A to SAC, at 3).

[33]     *Id.* ¶ 73.

[34]     *See id.* ¶ 76 ("The Argentine government has made certain changes in regulations and policies governing the energy sector to give absolute priority to domestic supply at low, stable prices in order to sustain economic recovery. . . . We cannot assure you that changes in applicable laws and regulations, or adverse judicial or administrative interpretations of such laws and regulations, will not adversely affect our results of operations. . . . Similarly, we cannot assure you that future government policies aimed at sustaining economic recovery or in response to domestic needs will not adversely affect the oil and gas industry.").

[35]     *Id.* ¶ 78.

Statement, discussed "risks and challenges relating to government regulation and control of the energy sector,"[36] as well as the risk of losing concessions contracts with Argentinian provinces.[37]

Plaintiffs contend that the above excerpts from the Registration Statement and Form 6-K were inaccurate and misleading for failing to disclose that:

> (i) Repsol was deliberately not investing in Argentinean exploration projects and, instead, was using the Company's profits to pay unusually high dividends to fund its international expansion efforts; (ii) YPF failed to finance domestic exploration and development, which caused the Company to breach its concession contracts with various Argentinean provinces; and (iii) YPF failed to invest domestically, which increased the risk that the Company would be nationalized.[38]

## C.   Misrepresentations and Omissions Under the Exchange Act

In addition to the alleged misrepresentations in the Registration

---

[36]      *Id.* ¶ 75.

[37]      *Id.* ¶ 77 ("[N]on-compliance with [the Hydrocarbons Law or the terms of the specific concessions or permits] may also result in the imposition of fines and in the case of material breaches . . . the revocation of the concession or permit. We cannot provide assurances that concessions that have not yet been renewed will be extended or that additional investment, royalty payment or other requirements will not be imposed on us in order to obtain extensions.  The termination of, or failure to obtain the extension of, a concession or permit could have a material adverse effect on our business and results of operations.").

[38]      *Id.* ¶ 79.

Statement, plaintiffs allege that YPF, Repsol and the Individual Defendants made many other misrepresentations and omissions of material fact during the Class Period.  Most of the offending statements were either optimistic predictions about the Vaca Muerta formation or expressions of YPF's commitment to increasing domestic investment and exploration.[39]  Plaintiffs argue that such statements were materially misleading because they failed to disclose:

> (i) that Repsol was deliberately not investing in Argentinean exploration projects[40] and, instead, was using YPF's profits to pay unusually high dividends and to fund Repsol's own international expansion efforts; (ii) that YPF's failure to finance domestic

---

[39]      *See id.* ¶¶ 119–151.  For example, on December 22, 2009, the start of the Class Period, YPF held a press conference to announce the Horizon 2014 Plan, a five-year plan that "stated its commitment to increasing domestic exploration." *Id.* ¶ 69(c).  On February 25, 2010, Repsol issued a press release indicating that YPF was increasing its exploration and production efforts.  *See id.* ¶ 127.  On September 29, 2010, at an event in Buenos Aires, Eskenazi stated that YPF planned to triple its investment in exploration compared to 2009 and "turn around a 12-year decline in oil production." *Id.* ¶ 132.  On December 7, 2010, Repsol announced the discovery of the Vaca Muerta oil fields, which it claimed revealed "significant non-conventional gas potential." *Id.* ¶¶ 59, 136.  On November 7, 2011, Repsol issued a press release announcing "its largest ever oil find . . . in the Vaca Muerta formation." *Id.* ¶ 140.  On February 8, 2012, Repsol issued a press release expressing optimistic predictions of Vaca Muerta's potential and indicating that YPF planned to drill new wells and continue to explore the area.  *See id.* ¶ 142.
          Plaintiffs allege that the existence of Vaca Muerta had been known for years, and that the "discovery" was announced in order to drive up YPF's share price.  *See id.* ¶ 59.

[40]      Plaintiffs allege that YPF's three hundred million dollar investment in Vaca Muerta was insufficient to conduct any meaningful development of the area. *See id.* ¶ 61.

exploration and development caused the Company to breach its concession contracts with various Argentinean provinces; (iii) that YPF's failure to invest domestically increased the risk that the Company would be nationalized; and (iv) that nationalization by the Argentinean government would likely have a severe adverse effect on shareholders and on the Company's market value.[41]

Plaintiffs claim that as a result of defendants' material misrepresentations or omissions, they purchased YPF ADSs at artificially inflated prices.[42]  Plaintiffs then suffered economic loss in the form of a seventy-five percent decline in the value of their YPF stock upon the announcement of nationalization on April 16, 2012.[43]

### D.    Scienter Allegations

Plaintiffs allege that all of the defendants knew that the statements identified in the SAC were materially false or misleading because the defendants were "privy to confidential propriety information concerning YPF," and "the ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or, at least, the reckless disregard of the personnel at the highest levels of the Company, including

---

[41]    *Id.* ¶ 125.

[42]    *See id.* ¶ 151.

[43]    *See id.* ¶ 160.

the Individual Defendants and Repsol."[44]

Plaintiffs cite the Mosconi Report for the proposition that Repsol deliberately underfunded YPF's exploration activities in Argentina in order to drive up energy prices and profit from the sale of the Vaca Muerta development rights.[45]  Plaintiffs also allege that Repsol was motivated by the desire to sell more than one billion dollars of its own shares of YPF stock at artificially inflated prices, as well as the desire to receive "abnormally high dividends" to finance its own international expansion.[46]

## III.   MOTION TO DISMISS STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "'accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor.'"[47]  The court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint,"[48] as well as "legally

---

[44]   *Id.* ¶¶ 152–153.

[45]   *See id.* ¶¶ 155–156.

[46]   *Id.* ¶ 157.

[47]   *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)).

[48]   *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

required public disclosure documents filed with the SEC[] and documents possessed by or known to the plaintiff [] upon which it relied in bringing the suit."[49]

The court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*.[50]  Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[51]  For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[52]  Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[53]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[49]     *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

[50]     *See* 556 U.S. 662, 678–79 (2009).

[51]     *Id.* at 679.

[52]     *Id.* at 678.

[53]     *Id.* at 679.

misconduct alleged."[54]   "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."[55]

## III.   APPLICABLE LAW

### A.   The Securities Act Claims

#### 1.   Section 11

Section 11 provides purchasers of registered securities with strict liability protection where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."[56]   To establish a prima facie claim under Section 11, "[a] plaintiff need only plead a material misstatement or omission in the registration statement."[57]   Liability is limited, however, to certain statutorily enumerated parties:

---

[54]   *Id.* at 678.

[55]   *Id.* (quotation marks omitted).

[56]   15 U.S.C. § 77k(a) (1998).

[57]   *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), *abrogated on other grounds,* 574 F.3d 29 (2d Cir. 2009)).

(1) signatories of the registration statement; (2) directors or partners of the issuer at the time of filing; (3) persons consenting to be named as about to become a director or partner; (4) accountants or other experts consenting to be named as preparing or certifying part of the registration statement; and (5) underwriters of the security at issue.[58]

## 2.    Section 12

Section 12(a)(2) holds any person liable who "offers or sells a security" by means of a materially false or misleading prospectus or oral communication.[59]  The elements of a prima facie claim under Section 12(a)(2) are:

(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'[60]

A "statutory seller" is defined as a person who either passes title to the plaintiff for value or successfully solicits the purchase while "motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner."[61]

---

[58]    *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 175 (2d Cir. 2011) (citing 15 U.S.C. § 77k(a)).

[59]    15 U.S.C. § 77*l*(a)(2).

[60]    *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (quoting 15 U.S.C. §77*l* (a)(2)).

[61]    *Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir. 1988) (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)) (applying *Pinter* standard to 12(a)(2) claims).

### 3.      The Statute of Limitations

Claims under Sections 11 and 12 of the Securities Act must be brought "within one year after discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence."[62]  In determining when a reasonable investor would have discovered the fraud, courts may take judicial notice of "'the *fact* that press coverage contained certain information, without regard to the truth of [its] contents.'"[63]

Determining "whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss. . . ."[64]  However:

> [C]ourts can readily resolve the issue of inquiry notice as a matter of law on a motion to dismiss . . . where the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint. . . .  Given the objective standard for inquiry notice, there is an inherent sliding scale in assessing whether inquiry notice was triggered by information in the public domain: the more widespread and prominent the public information disclosing the facts underlying the fraud, the more

---

[62]      15 U.S.C. § 77m.

[63]      *Rivas v. Fischer,* 687 F.3d 514, 520 n.4 (2d Cir. 2012) (quoting *Staehr v. Hartford Fin. Servs. Grp.,* 547 F.3d 406, 425 (2d Cir. 2008)).

[64]      *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (quotation marks and citations omitted).

accessible this information is to plaintiffs. . . .[65]

## B.     The Exchange Act Claims

### 1.     Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance. . . ."[66]  Rule 10b-5, promulgated thereunder, makes it illegal to "make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security."[67]  To sustain a claim for securities fraud under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[68]

### a.     Material Misrepresentations or Omissions

An omission is considered material when there is "a substantial

---

[65]     *Staehr,* 547 F.3d at 412, 432 (quotation marks and citations omitted).

[66]     15 U.S.C. § 78j(b) (1934).

[67]     17 C.F.R. § 240.10b-5 (1951).

[68]     *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

likelihood that the disclosure of the [omitted fact] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information []

available."[69]   There is no duty to disclose information that is "'equally available to

both parties'"[70] or "so basic that any investor could be expected to know it."[71]

Similarly, there is no duty to disclose information that has been "widely reported in

readily available media."[72]

An omission is only actionable "when the failure to disclose renders a

---

[69]   *In re ProShares Trust Sec. Litig.,* 728 F.3d 96, 102 (2d Cir. 2013) (emphasis in original).  *Accord Basic Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988).

[70]   *In re WorldCom, Inc. Sec. Litig.,* 346 F. Supp. 2d 628, 687–88 (S.D.N.Y. 2004) (noting that "there is no duty to disclose information to one who reasonably should already be aware of it," and that "where information is equally available to both parties, a defendant should not be held liable to the plaintiff under securities laws for failure to disclose") (quoting *Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir. 1978)).

[71]   *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Levitin v. PaineWebber, Inc.,* 159 F.3d 698, 702 (2d Cir. 1998)).

[72]   *United Paperworkers Int'l Union v. International Paper Co.,* 985 F.2d 1190, 1199 (2d Cir. 1993).  *Accord Seibert,* 586 F.2d at 952 (finding no obligation to disclose developments that were "reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions"); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265, at *32 (S.D.N.Y. Sept. 28, 2012) ("The law in this Circuit is clear that a party 'can be relieved of a duty to disclose when certain developments affecting a corporation become matters of general public knowledge.'") (quoting *In re Fuwei Films Sec. Litig.,* 634 F. Supp. 2d 419, 437 (S.D.N.Y. 2009)) (some quotation marks omitted).

statement misleading."[73]   There is no duty to "disclose all information even

tangentially related to the subject matter of a statement."[74]   However, "[s]ome

literally accurate statements can, through their context and manner of presentation,

[become] devices which mislead investors."[75]

    **b.**    **Scienter**

    Allegations of scienter under Section 10(b) must meet the heightened

pleading standards of both Federal Rule of Civil Procedure 9(b) and the Private

Securities Litigation Reform Act ("PSLRA").   *First*, Rule 9(b), which applies to

allegations of fraud or mistake, requires plaintiffs to allege the circumstances

constituting fraud with particularity.[76]   However, "[m]alice, intent, knowledge, and

other conditions of a person's mind may be alleged generally."[77]

    *Second*, the PSLRA provides that, in actions alleging securities fraud,

---

[73]    *In re Alstom SA,* 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).

[74]    *In re Hardinge, Inc. Sec. Litig.,* 696 F. Supp. 2d 309, 321 (W.D.N.Y. 2010) (finding duty to disclose information only if it is "'sufficiently connected to Defendants' existing disclosures to make those public statements misleading'" (quoting *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008))).

[75]    *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 92 (2d Cir. 2010) (quotation marks and citation omitted).

[76]    *See* Fed. R. Civ. P. 9(b).

[77]    *Id.*

"the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[78]  The required level of scienter is either "intent to deceive, manipulate, or defraud"[79] or "reckless disregard for the truth."[80]  In the Second Circuit, plaintiffs may meet the requirements of the PSLRA by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[81]  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[82]

### c.    Reliance and Loss Causation

To demonstrate reliance, plaintiffs must allege that, "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into

---

[78]    15 U.S.C.A. § 78u-4(b)(2) (2010).

[79]    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[80]    *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean conscious recklessness – i.e., a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.") (emphasis in original) (quotation marks and citations omitted).

[81]    *ATSI*, 493 F.3d at 99 (citing *Ganino*, 228 F.3d at 168–69).

[82]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007).

the detrimental securities transaction."[83] "[I]f a market is shown to be efficient,

courts may presume that investors who traded securities in that market relied on

public, material misrepresentations regarding those securities."[84]  However, "[a]ny

showing that severs the link between the alleged misrepresentation and either the

price received (or paid) by the plaintiff, or his decision to trade at a fair market

price, will be sufficient to rebut the presumption of reliance."[85]  If "news of the

[concealed information] credibly entered the market and dissipated the effects of

the misstatements, those who traded [in the company's] shares after the corrective

statements would have no direct or indirect connection with the fraud."[86]

Loss causation, by contrast, is "the proximate causal link between the

alleged misconduct and the plaintiff's economic harm."[87]  "A misrepresentation is

'the proximate cause of an investment loss if the risk that caused the loss was

---

[83]     *ATSI,* 493 F.3d at 106.

[84]     *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S. Ct. 1184,
1192 (2013) (citing *Basic,* 485 U.S. at 245–47.)

[85]     *Basic,* 485 U.S. at 248.

[86]     *Id.* at 249; *Ganino,* 228 F.3d at 167 ("A defendant may rebut the
presumption that its misrepresentations have affected the market price of its stock
by showing that the truth of the matter was already known.").

[87]     *ATSI*, 493 F.3d at 106–07.

within the zone of risk concealed by the misrepresentations. . . .'"[88]  To prove loss

causation, "plaintiffs must distinguish the alleged fraud from the 'tangle of [other]

factors' that affect a stock's price."[89]

### 2.    Section 20(a)

Section 20(a) of the Exchange Act creates a cause of action against

"control persons" of the primary violator.[90]  "To establish a prima facie case of

control person liability, a plaintiff must show (1) a primary violation by the

controlled person, (2) control of the primary violator by the defendant, and (3) that

the defendant was, in some meaningful sense, a culpable participant in the

controlled person's fraud."[91]  Where there is no primary violation, there can be no

"control person" liability under Section 20(a).[92]

### C.    Leave to Amend

---

[88]    *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010)
(quoting *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir. 2005))
(some quotation marks omitted).

[89]    *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 568 F. Supp.
2d 349, 363 (S.D.N.Y. 2008) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,
342–43 (2005)).

[90]    *See* 15 U.S.C. § 78t(a).

[91]    *ATSI*, 493 F.3d at 108.

[92]    *See id.  See also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266,
297–98 (S.D.N.Y. 2006).

Whether to permit a plaintiff to amend its complaint is a matter committed to a court's "sound discretion."[93]  Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."[94]  "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."[95]  In particular, it is the usual practice to grant at least one chance to plead fraud with greater specificity when a complaint is dismissed under Rule 9(b).[96]  Leave to amend should be denied, however, where the proposed amendment would be futile.[97]

## IV.   DISCUSSION

### A.   The Securities Act Claims Are Time-Barred

#### 1.   The Statute of Limitations Began to Run Before April 16, 2012

Plaintiffs allege that the Registration Statement was materially misleading for failing to disclose YPF's inadequate investment in domestic

---

[93]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[94]    Fed. R. Civ. P. 15(a).

[95]    *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

[96]    *See ATSI,* 493 F.3d at 108.

[97]    *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87–88 (2d Cir. 2002).

exploration and the resulting heightened risk of nationalization.[98]  However, Argentina's dissatisfaction with YPF's domestic investment levels and the risk of nationalization were widely discussed in major media reports months before nationalization actually occurred.[99]

The SAC identifies several such media reports.  It notes that on January 30, 2012, outside sources indicated that "Argentine officials were discussing a government takeover of YPF because of the Company's lack of investment."[100]  In response, YPF's stock fell by more than ten percent.[101] Similarly, on February 29, 2012, Brufau met with President Kirchner "to discuss government criticism of the Company's domestic investment.  In response to the additional speculation regarding a government takeover, YPF's ADSs declined

---

[98]     *See* SAC ¶ 79.

[99]     *See, e.g., In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 502–03, 506 (S.D.N.Y. 2010) (single public report rendered Securities Act claim untimely).

[100]     SAC ¶ 89.  Although the SAC does not identify the "outside source," defendants refer to a January 30, 2012 article published by Bloomberg entitled "YPF Tumbles Most in Six Months on Report of Takeover: Buenos Aires Mover." *See* Ex. A to 11/26/13 Declaration of Abby F. Rudzin, Underwriters' counsel ("Rudzin Decl.").

[101]     *See* SAC ¶ 89.

$4.26 per ADS, or over 14%."[102]

In addition, many other media reports discussed YPF's domestic investment levels and the risk of nationalization prior to April 16, 2012.[103]  For example, on February 4, 2012, the Argentinian Planning Minister criticized YPF's lack of production and investment in domestic oil, stating that YPF had "not conducted the investment necessary to expand its refineries in the timeframe needed by the sustained growth in demand in the country."[104]  On February 26, 2012, the Financial Times published an article entitled "Argentina Chides Repsol YPF Investment."[105]  Regular media coverage continued throughout March and April.[106]

---

[102]   *Id.* ¶ 93. That same day, the Wall Street Journal published an article entitled "YPF Shares Fall on Takeover Fears."  *See* Ex. B to Rudzin Decl.

[103]   *See Rivas,* 687 F.3d at 520 n.4 (finding that courts may take judicial notice of "the fact that press coverage contained certain information, without regard to the truth of [its] contents").

[104]   SAC ¶ 90.

[105]   *See* Ex. E to Rudzin Decl.

[106]   *See, e.g., Argentina Considers Proposal to Nationalize YPF, El Dia Reports,* Bloomberg, March 17, 2012, Ex. H to Rudzin Decl.; *YPF Tracks ADR Drop on Intervention Concern*, Bloomberg, April 3, 2012, Ex. J to Rudzin Decl. (reporting that "Kirchner may send a bill to congress this week proposing the government acquire a stake in YPF"); *Argentina, YPF No Closer to Resolution,* The Wall Street Journal, April 12, 2012, Ex. L to Rudzin Decl. (reporting that a draft bill had been sent to congress for a vote).

In light of the widespread national coverage of the risk of nationalization and YPF's alleged underinvestment, plaintiffs should have discovered the alleged omissions in the Registration Statement long before April 16, 2012.[107] At the very latest, plaintiffs should have discovered the alleged omissions by March 1, 2012. Therefore, even with the benefit of *American Pipe* tolling, plaintiffs would have had to reassert the Securities Act claims by June 29, 2013. It is undisputed that plaintiffs failed to reassert the claims by that time.[108]

Plaintiffs allege that Repsol and YPF made optimistic public announcements that neutralized the risks reported by the media. Specifically, they note that on February 8, 2012, and February 29, 2012, Repsol announced encouraging results from an audit of Vaca Muerta and stated that "in 10 years its capacity could double Argentina's existing gas and oil production."[109] Similarly, on March 29, 2012, YPF published a letter reporting that it had discovered

---

[107]    *See Freidus v. Barclays Bank PLC,* 734 F.3d 132, 138 (2d Cir. 2013) (dismissing Securities Act claims brought more than a year after corrective disclosures); *Amorosa v. AOL Time Warner, Inc.,* 409 Fed. App'x 412, 416 (2d Cir. 2011) ("The corrective disclosure date is the same as the constructive notice date for purposes of [the statute of] limitations.").

[108]    *See* Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Second Consolidated Amended Complaint ("Pl. Mem.") at 40.

[109]    SAC ¶¶ 91, 94, 143, 142.

significant additional oil resources in Vaca Muerta.[110]

None of these "reassurances" delayed the running of the statute of limitations. *First,* although the statements expressed optimism about the potential of Vaca Muerta, they did not suggest that nationalization was no longer a material risk.[111] *Second,* the announcements concerned future investment plans and thus had no bearing on whether the Registration Statement omitted material information in November of 2010.[112]  For these reasons, none of the statements identified by plaintiffs extend the date that a reasonable investor would have discovered the alleged omissions from the Registration Statement.

> ### 2.  Plaintiffs Claims Are Untimely Even If the Statute of Limitations Began to Run on April 16, 2012

---

[110]    *See id.*  ¶¶ 96, 144.

[111]    *See LC Capital Partners LP v. Frontier Ins. Grp., Inc.,* 318 F.3d 148, 155 (2d Cir. 2003) ("[R]eassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern."); *In re MBIA Inc.*, No. 05 Civ. 3514, 2007 WL 473708, at *8 (S.D.N.Y. Feb. 14, 2007) (noting that optimistic press release did not specifically address the concerns raised in a published report, which had put the public on notice of the probability of deception, and would not have allayed the concerns of a reasonable investor); *De la Fuente v. DCI Telecomm., Inc.,* 206 F.R.D. 369, 385 (S.D.N.Y. 2002) (allegedly reassuring statements that focused on issuer's overall future and did not comment on the challenged accounting methodologies did not delay date that a reasonable investor would have discovered the fraud).

[112]    Moreover, many press reports discussed the high risk of nationalization even after the so-called reassurances.  *See supra* note 99.

Even if the Court credited plaintiffs' argument that the statute of limitations did not begin to run until nationalization was announced on April 16, 2012, plaintiffs missed the deadline to reassert their Securities Act claims. Plaintiffs claim that they filed the February 5 Complaint with seventy days remaining on the statute of limitations.[113]  Because the CAC was filed on June 6, 2013, they argue, any abandoned class members had until August 15, 2013 to intervene and reassert their claims.

However, the CAC was filed on June 5, not June 6.  The Court set June 5 as the deadline in its scheduling order and rejected plaintiffs' request for an extension.[114]  Plaintiffs point out that they filed the CAC at 12:00 AM on the night of June 5, so the document is reflected on the docket as having been filed on June 6.[115]  However, plaintiffs' decision to wait until literally the last minute to file does not grant class members an extra day of tolling.

Although plaintiffs served some of the defendants with a draft complaint before August 14, 2013, serving a draft complaint does not constitute

---

[113]    *See* Pl. Mem. at 53.

[114]    *See* Endorsed Letter, Dkt. No. 26.

[115]    *See* Pl. Mem. at 54.

28

"bringing an action" under the terms of the Securities Act.[116]  Plaintiffs did not file

a motion for leave to amend or seek the Court's permission to do so by August 14,

2013.[117]  Therefore, plaintiffs' Securities Act claims are untimely even if the statute

of limitations did not begin to run until April 16, 2012.[118]

> ### 3.    If the Statute of Limitations Did Not Begin to Run Until the Publication of the Mosconi Report, the Securities Act Claims Fail for Lack of Causation

In an attempt to creatively circumvent the statute of limitations,

plaintiffs argue that the material omission was not YPF's inadequate investment or

the risk of nationalization, but rather Repsol's "deliberate strategy" of

underinvestment that "ultimately caused YPF to be nationalized."[119]  This

---

[116]    *See American Pipe,* 414 U.S. at 561 (noting that "the intervenors thus had 11 days after the entry of the order denying them participation in the suit as class members in which to *move for permission to intervene*") (emphasis added); *Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir. 2000) ("When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes.").

[117]    On August 15, 2013, the Court instructed plaintiffs *sua sponte* not to file an amended complaint so the issue could be discussed at the next conference.

[118]    I note in passing that plaintiffs are not entitled to equitable tolling because they have not demonstrated that they "pursued their rights diligently" and were prevented from filing due to "extraordinary circumstance[s]."  *A.Q.C. ex rel Castillo v. United States,* 656 F.3d 135, 144 (2d Cir. 2011).

[119]    Pl. Mem. at 47.  *Accord* SAC ¶ 79 (characterizing excerpts from Registration Statement as misleading for failing to disclose that Repsol was

deliberate strategy, they argue, could not have been discovered until the publication of the Mosconi Report on June 1, 2012.[120]

Plaintiffs' argument proves too much.  To the extent that plaintiffs' claim is premised on the failure to disclose Repsol's strategy, such omission lacks any causal connection to the plaintiffs' losses.  The Mosconi Report was not published until June 1, 2012, so any misrepresentations or omissions exposed for the first time by the Report cannot have caused YPF's stock to drop on April 16, 2012.[121]  Furthermore, plaintiffs do not allege that the government of Argentina was privy to Repsol's hidden scheme.  Thus, any undisclosed plans or motives had no impact on the government's decision to nationalize YPF, and no connection to plaintiffs' losses.  Therefore, even if the Court accepted plaintiffs' alternate framing of the alleged omissions, the Securities Act claims must be dismissed.

**B.**   **Plaintiffs Fail to State a Claim against YPF or Repsol  Under the Exchange Act**

---

"deliberately not investing in Argentinean exploration projects").

[120]   *See* Pl. Mem. at 42–43.  Plaintiffs raise this argument for the first time in their opposition brief.  In fact, the SAC explicitly alleges that "only on April 16, 2012 were YPF investors on notice that YPF's previous public statements that the Company was increasing its commitment to domestic energy exploration were materially false and misleading and misrepresented the risk of nationalization." SAC ¶ 99.

[121]   Plaintiffs do not allege that they were harmed by a drop in share price after the Mosconi Report was published.  *See id.* ¶¶ 160–162.

1.    **Plaintiffs' Allegations Fall Short of the Required Specificity Under Rule 9(b) and the PSLRA**

Plaintiffs fail to plead claims under the Exchange Act with the specificity required by Rule 9(b) and the PSLRA.  Those provisions "require that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[122]

Here, plaintiffs list numerous statements made by the defendants and their representatives over the course of several years.  Many of those statements are presented in the form of large block quotations from press releases and public filings.[123]  Plaintiffs then allege generally that *all* of the statements were misleading for the same four reasons.[124]  Plaintiffs do not distinguish which statements are

---

[122]    *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004) (quotation marks and citations omitted).  Similarly, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

[123]    *See, e.g.,* SAC ¶¶ 127, 129, 130–131, 133, 136, 137, 139, 141–143.

[124]    *See id.* ¶¶ 134, 145 (indicating that the statements in paragraphs 126–133 and 136–144 are all materially misleading "for the reasons set forth above in ¶ 125").

attributable to which defendants,[125] or why each statement was misleading for failing to disclose the four alleged omissions.  Thus, plaintiffs fail to state a claim for securities fraud with the requisite particularity, and those claims must be dismissed.[126]

### 2.    Plaintiffs Fail to Identify Any Actionable Misrepresentations or Omissions

The alleged misrepresentations identified by plaintiffs include optimistic characterizations of Vaca Muerta's potential and statements about YPF's plans to increase domestic investment and exploration.[127]  Plaintiffs further

---

[125]    Indeed, plaintiffs concede that many of the allegedly misleading statements are not attributable to YPF.  *See* Pl. Mem. at 14 n.6.

[126]    *See, e.g., Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*, No. 10 Civ. 864, 2013 WL 1345086, at *5 (E.D.N.Y. Mar. 29, 2013) (dismissing complaint containing "many long block quotes of public statements made by [defendant], with smaller sections alleged to be misleading highlighted in bold. . . . [which] often follow one after the other without Plaintiffs' explaining how and why each individual section is misleading"); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) (dismissing complaint because "[p]laintiffs [sic] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements"); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534–35 (S.D.N.Y. 2005) (dismissing claims where "[p]laintiffs neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts").

[127]    *See* SAC ¶¶ 126–133, 136–144.

allege that those statements were all materially misleading because they failed to disclose Repsol's 1) deliberate failure to invest in domestic exploration, allegedly motivated by the desire to use high dividends to finance its own international operations, 2) the fact that such underinvestment led to breaches of concessions contracts with provinces and increased the risk of nationalization, and 3) the fact that nationalization would have a severe negative effect on YPF's value.[128]

Many of these alleged omissions were either fully disclosed or matters of public knowledge. For example, the negative effect of nationalization on YPF's share price would have been obvious to any reasonable investor.[129] Indeed, plaintiffs admit that YPF's stock dropped in response to each major media report about the risk of nationalization, indicating that investors understood the likely impact on share price.[130]

Moreover, YPF's dividends and investments in Argentina were

---

[128]    *See id.* ¶ 125.

[129]    *See Levitin*, 159 F.3d at 702 (noting that an omitted fact is considered immaterial when it "is so basic that any investor could be expected to know it").

[130]    *See* SAC ¶¶ 89, 93. *See also* Pl. Mem. at 37 ("Reasonable investors would not view a government takeover of a public company as a positive development . . . .").

disclosed in public filings throughout the Class Period.[131]  Plaintiffs do not contest

the existence or the accuracy of those disclosures.[132]  Instead, plaintiffs argue that

Repsol should have characterized its investment levels as "inadequate" and

explained that such inadequacy elevated the risk of nationalization.[133]

However, plaintiffs propose no objective measure for determining the

adequacy of YPF's investments in Argentina.  Instead, plaintiffs argue that the

investments were inadequate according to the government of Argentina, but do not

allege that defendants had any non-public information about the government's

---

[131]     *See, e.g.,* Excerpts from YPF's Form 20-F filed with the SEC on April 12, 2011, Ex. O to 11/26/13 Declaration of Thomas J. Hall ("Hall Decl."), YPF's counsel, at 155 (listing YPF's dividend payments each quarter from 2002 to 2010); Excerpts from YPF's Form 20-F filed with the SEC on April 12, 2011, Ex. B to Hall Decl., at 23–24, 32–34 (disclosing YPF's developed and undeveloped acreage in Argentina and abroad, YPF's oil and gas production in Argentina for each of the prior three years, YPF's production costs in Argentina and abroad for each of the prior three years, and the number of new wells YPF drilled in Argentina during each of the prior three years); Excerpts from Registration Statement, Ex. B to 11/26/13 Declaration of Christopher R. Harris, Repsol's counsel, at 34 (disclosing that "Repsol and Petersen Energía agree that the dividend policy of the Issuer should be to distribute 90% of the Issuer's profits as dividends").

[132]     *See* Pl. Mem. at 15 ("Plaintiffs do not challenge the accuracy of YPF's 'hard' numbers regarding investments, costs or any other financial metric relating to its domestic oil and gas projects. Rather, the SAC alleges that the Company Defendants concealed that those investment figures were grossly inadequate.").

[133]     *See id.*

views.[134]  There is no duty to disclose the subjective views of a third party, or to predict the likelihood of future events, if such information is equally available to the public.[135]

To the extent that plaintiffs argue that the statements are misleading for failing to disclose Repsol's true motives and intentions,[136] those allegations have no causal connection to plaintiffs' losses.  Plaintiffs do not allege that the government of Argentina was aware of Repsol's motives or intentions.  Therefore, those motives had no impact on the government's decision on April 16, 2012 to nationalize YPF, which allegedly caused plaintiffs' losses.[137]

Finally, the alleged omissions are not sufficiently related to the

---

[134]    Although the SAC alleges that the government expressed dissatisfaction with YPF's investment levels on several occasions, plaintiffs do not indicate whether those communications occurred privately or publicly.  *See* Pl. Mem. at 19 (citing SAC ¶¶ 51, 57, 90).

[135]    *See Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000) (finding "allegations that defendants should have anticipated future events" insufficient to state a claim for securities fraud); *WorldCom,* 346 F. Supp. 2d at 687–88 (no duty to disclose information "'equally available to both parties'") (quoting *Seibert,* 586 F.2d at 952).

[136]    Plaintiffs argue that, "[b]y concealing their true motives, the Company Defendants gave a false impression of YPF's business operations, notwithstanding the purported accuracy of its financial reporting."  Pl. Mem. at 16 (quotation marks and citations omitted).

[137]    *See supra* Part IV.A.3.

subject matter of the statements to render those statements misleading. Plaintiffs

argue that defendants' optimistic announcements about Vaca Muerta's potential

and other plans for domestic investment led investors to believe that YPF was

adequately addressing the government's concerns.[138] However, neither factual

statements about Vaca Muerta's potential nor general statements of intent to

increase domestic investment would lead a reasonable investor to believe that the

government of Argentina approved of YPF, or that nationalization was no longer a

material risk.

### 3. Plaintiffs Fail to Adequately Allege Scienter Against YPF

Plaintiffs' scienter allegations are almost entirely directed towards

Repsol. Specifically, plaintiffs allege that Repsol was motivated by the desire to

force a change in Argentina's price management policy,[139] to reap large dividends

to fund its international expansion, and to sell its YPF stock at an artificially

inflated price.[140] They further allege that Repsol was YPF's controlling

---

[138]   *See* Pl. Mem. at 20.

[139]   *See id.* at 26; SAC ¶ 69(b).

[140]   *See* SAC ¶¶ 7, 60. *See also Cherry St.,* 573 F.3d at 108–09 (noting
that scienter requirement "is generally met when corporate insiders [a]re alleged to
have misrepresented to the public material facts about the corporation's
performance or prospects in order to keep the stock price artificially high while
they sold their own shares at a profit") (quotation marks and citations omitted).

shareholder, providing it with the opportunity to commit the fraud.[141]

However, none of plaintiffs' allegations suggest that YPF "benefitted in some concrete and personal way from the purported fraud."[142]  Indeed, the alleged scheme appears contrary to YPF's interests.  As plaintiffs allege, "the purpose of Repsol was to milk dry YPF, and make money at any cost since they left a total mess of the company with record low production and record low reserves."[143]

In fact, the SAC makes no scienter allegations specific to YPF.  The SAC alleges generally that *all* of the defendants knew the statements were materially false and misleading because they were "privy to confidential propriety information concerning YPF,"[144] and because "the ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or, at least, the reckless disregard of the personnel

---

[141]    The scienter allegations against Repsol are specific and plausible enough to state a claim, assuming plaintiffs could adequately allege omissions, reliance, and loss causation.

[142]    *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009).

[143]    SAC ¶ 11 (quoting the Mosconi Report, Ex. A to SAC).

[144]    *Id.* ¶ 152.

at the highest levels of the Company."[145]  However, such general allegations fall far

short of demonstrating "motive and opportunity" or "strong circumstantial

evidence."[146]  Therefore, plaintiffs' Section 10(b) claims against YPF are

dismissed for failure to adequately plead scienter.[147]

### 4. Plaintiffs Have Not Adequately Alleged Loss Causation

Finally, plaintiffs fail to adequately plead loss causation in light of the

extensive media coverage about the risk of nationalization, which severed the

"causal link between the alleged misconduct and [plaintiffs'] economic harm."[148]

Plaintiffs claim that YPF's stock plummeted on April 16, 2012 because investors

discovered the concealed risks for the first time.  However, given the media

coverage throughout January, February, and March, plaintiffs' theory is not

plausible.  The drop in YPF's share price after the announcement of nationalization

likely represented the materialization of a known risk, rather than the disclosure of

---

[145]    *Id.* ¶ 153.

[146]    *ATSI*, 493 F.3d at 99.

[147]    Plaintiffs argue that YPF cannot have been ignorant of Repsol's plan because YPF's officers were hand-picked by Repsol based on their relationship with the government of Argentina.  *See* Pl. Mem. at 31.  This argument constitutes weak circumstantial evidence at best, and falls far short of the heightened pleading standards of Rule 9(b) and the PSLRA.

[148]    *ATSI*, 493 F.3d at 106–07.

a concealed one.  Therefore, plaintiffs' Section 10(b) claim is dismissed for failing

to plausibly allege loss causation.[149]

Defendants additionally point out that Lead Plaintiff Felix Portnoy

first purchased YPF ADSs on April 2, 2012,[150] long after the risk of nationalization

became public knowledge.[151]  It is true that widespread publication of the alleged

omissions can rebut the "fraud on the market" presumption and negate reliance.[152]

However, I need not reach this argument given the other grounds for dismissal.

### 5.    The Section 20(a) Claim Fails for Lack of a Primary Violation

"Any claim for 'control person' liability under § 20(a) of the

Exchange Act must be predicated on a primary violation of securities law."[153]

---

[149]    Plaintiffs point out that Markovic also has standing to assert Section 10(b) claims.

[150]    *See* Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws, Ex. C to 4/8/13 Declaration of Mario Alba Jr. in Support of the Motion of Felix Portnoy for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel, Dkt. No. 16.

[151]    *See supra,* Part IV.A.1.

[152]    *See Basic,* 485 U.S. at 248–49 (noting that if "news of the [concealed information] credibly entered the market and dissipated the effects of the misstatements, those who traded [in the company's] shares after the corrective statements would have no direct or indirect connection with the fraud").

[153]    *Pacific Inv. Mgmt Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010).

Because plaintiffs have failed to alleged a primary violation under Section 10(b), their claim under Section 20(a) must also be dismissed.

**C.      Leave to Amend**

On October 8, 2013, after multiple letter exchanges and several conferences, I granted plaintiffs' request for leave to amend their complaint to reassert the Securities Act claims.  However, I indicated to the parties that plaintiffs would not be granted another chance to amend if those claims were found untimely on a motion to dismiss.  Because plaintiffs have already been given a second opportunity to present their strongest facts and arguments regarding timeliness, the Securities Act claims are hereby dismissed with prejudice.

Similarly, leave to amend the Exchange Act claims is denied as futile. Plaintiffs fail to state a claim on multiple grounds: particularity, material misrepresentations or omissions, scienter (against YPF), and loss causation.  On amendment, plaintiffs could potentially state their claims with greater particularity and add new scienter allegations.

However, the failure to identify any actionable misrepresentations or omissions is not curable through amendment.  Plaintiffs concede that YPF's dividends and expenditures on investment and exploration in Argentina were

publicly disclosed.[154]  To the extent that defendants concealed Repsol's "strategy of depredation [and] disinvestment,"[155] such an omission lacks any causal connection to plaintiffs' losses.  To the extent that defendants concealed the government's dissatisfaction with their investments, plaintiffs have not alleged that defendants had any non-public information regarding the government's views that would trigger a duty to disclose.  Finally, the alleged omissions are not sufficiently related to defendants' affirmative statements to render those statements misleading.

Moreover, the allegations in the SAC and publicly available media reports negate loss causation.  Given the extensive media coverage about the risk of nationalization in January, February, March, and early April of 2012, it is not plausible that the drop in YPF's share price on April 16, 2012 resulted from the public's discovery of that risk.  Because the above flaws are not curable through renewed pleading, amendment would be futile.

The Individual Defendants have not moved to dismiss the SAC. Indeed, most of them have not yet been served and have not entered an appearance

---

[154]    *See* Pl. Mem. at 15 ("Plaintiffs do not challenge the accuracy of YPF's 'hard' numbers regarding investments, costs or any other financial metric relating to its domestic oil and gas projects.").

[155]    SAC ¶ 65.

through counsel.[156]  However, the above arguments apply with equal force to the claims against the Individual Defendants, because those claims are premised on the same alleged omissions and the same alleged economic loss.  Rather than requiring the Individual Defendants to submit a new motion on issues that have already been decided, the claims against the Individual Defendants are hereby dismissed *sua sponte*.

## V.   CONCLUSION

For the foregoing reasons, all three motions to dismiss are GRANTED with prejudice.  The claims against the Individual Defendants are dismissed *sua sponte*.  The Clerk of Court is directed to close these motions (Dkt. Nos. 42, 45, and 48) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      February 20, 2014
            New York, New York

---

[156]    *See* SAC ¶¶ 23 n.4, 30 n.5.

42

**-Appearances -**

**For Plaintiffs:**

David Avi Rosenfeld, Esq.
Samuel Howard Rudman, Esq.
Mario Alba, Jr., Esq.
Avital Orly Malina, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173

**For Defendant YPF Sociedad Anonima:**

Thomas Joseph Hall, Esq.
Marcelo Marlow Blackburn, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5487
Fax: (212) 541-5369

**For Defendants Morgan Stanley, Goldman Sachs, and Credit Suisse:**

Jonathan Rosenberg, Esq.
Edward Nathaniel Moss, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
(212) 326-2000
Fax: (212) 326-2061

**For Defendant Repsol:**

James E. Brandt, Esq.
Jason Kolbe, Esq.
Christopher Harris, Esq.
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200
Fax: (212) 751-4864